## STATE OF CONNECTICUT *v.* MARTIN GEISLER
## (14365)

PETERS, C. J., SHEA, GLASS, COVELLO and BERDON, Js.

Argued February 19—decision released June 18, 1992

*Leon F. Dalbec, Jr.,* assistant state's attorney, with whom, on the brief, was *Steven M. Sellers,* assistant state's attorney, for the appellant (state).

*Richard Emanuel,* assistant public defender, with whom, on the brief, was *G. Douglas Nash,* public defender, for the appellee (defendant).

BERDON, J. In this appeal, the issue we certified for review is whether "the Appellate Court [was] correct in reversing the trial court's factual finding that the police reasonably believed that the defendant was in need of emergency assistance, thus rendering entry of the defendant's home lawful under the emergency doctrine?" *State* v. *Geisler,* 220 Conn. 918, 597 A.2d 342 (1991). We conclude that the Appellate Court properly held, on the basis of the facts found by the trial court, that pursuant to the state constitution the warrantless entry was not justified under the emergency doctrine. Therefore, we affirm the judgment of the Appellate Court.

In a three count substitute information, the defendant, Martin Geisler, was charged with operating a motor vehicle while under the influence of intoxicating liquor in violation of General Statutes § 14-227a (a) (2),[1] assault in the second degree with a motor vehicle in violation of General Statutes § 53a-60d[2] and evading responsibility in violation of General Statutes

[1] General Statutes § 14-227a (a) (2) provides in relevant part: "No person shall operate a motor vehicle while under the influence of intoxicating liquor or any drug or both. A person commits the offense . . . if he operates a motor vehicle . . . while the ratio of alcohol in the blood of such person is ten-hundredths of one per cent or more of alcohol, by weight." In the context of this case, violation of § 14-227a constitutes a misdemeanor. General Statutes § 14-227a (h) (1).

[2] General Statutes § 53a-60d provides in relevant part: "(a) A person is guilty of assault in the second degree with a motor vehicle when, while operating a motor vehicle under the influence of intoxicating liquor or any drug or both, he causes serious physical injury to another person as a consequence of the effect of such liquor or drug.

"(b) Assault in the second degree with a motor vehicle is a class D felony . . . ."

§ 14-224 (a).[3] The charges stemmed from a motor vehicle accident involving the defendant and Mark Brunstad, who was operating a motorcycle.

On January 27, 1988, the trial court, *Lewis, J.,* denied the defendant's motion to suppress the results of the defendant's blood alcohol tests, the defendant's statements made at his home and at the station house, and the videotape of the defendant's arrest. The trial court found that the evidence had been properly obtained because exigent circumstances justified the police officers' warrantless entry into the defendant's home, which subsequently resulted in his arrest. Thereafter, a jury convicted the defendant on all three counts.

The defendant did not appeal the judgment of his conviction for evading responsibility. The defendant appealed from the judgment convicting him of operating a motor vehicle while under the influence of intoxicating liquor and assault in the second degree with a motor vehicle. The Appellate Court, sitting en banc, with three judges dissenting, set aside the convictions, holding that the trial court should have granted the defendant's motion to suppress the evidence obtained after the warrantless entry. *State* v. *Geisler,* 22 Conn. App. 142, 148, 576 A.2d 1283 (1990) *(Geisler I).* The Appellate Court remanded the case to the trial court with direction to render a judgment of acquittal on the charge of operating a motor vehicle while under the influence of intoxicating liquor[4] and to conduct a new

---

[3] General Statutes § 14-224 (a) provides in relevant part: "Each person operating a motor vehicle who is knowingly involved in an accident which causes serious physical injury, as defined in section 53a-3, to or results in the death of any other person shall at once stop and render such assistance as may be needed and shall give his name, address and operator's license number and registration number to the person injured or to any officer or witness to the death or serious physical injury of any person . . . ." Violation of § 14-224 (a) constitutes a felony. General Statutes § 14-224 (d).

[4] In ruling on the charge of operating a motor vehicle while under the influence of intoxicating liquor, the Appellate Court held that even if the

trial on the second degree assault charge. This court denied the state's petition for certification. *State* v. *Geisler,* 215 Conn. 819, 576 A.2d 547 (1990).

Thereafter, the state petitioned the United States Supreme Court for a writ of certiorari, raising two questions.[5] The first question sought a determination that the Appellate Court had improperly applied the emergency doctrine exception to the warrant requirement for a search of a private dwelling. In the second question, the state alternatively claimed that even if the entry into the private dwelling was illegal, suppression of the evidence subsequently obtained outside the home and at the police station was not required under *New York* v. *Harris,* 495 U.S. 14, 110 S. Ct. 1640, 109 L. Ed. 2d 13 (1990). The court granted the petition for a writ of certiorari as to the second issue, vacated the Appellate Court's judgment and remanded the case to the Appellate Court for further consideration in light of *New York* v. *Harris,* supra. *Connecticut* v. *Geisler,* 498 U.S. 1019, 111 S. Ct. 663, 112 L. Ed. 2d 657 (1991).

On remand, the Appellate Court, sitting en banc, with two judges dissenting, concluded that although under *Harris* the federal exclusionary rule would not require suppressing the evidence obtained by the police after they left the defendant's home, the Connecticut constitution extends greater protection to citizens of our

---

evidence at issue were admissible, General Statutes § 14-227a requires expert evidence extrapolating the results of a blood alcohol test back to the time of the operation of the motor vehicle. *State* v. *Geisler,* 22 Conn. App. 142, 162, 576 A.2d 1283 (1990), cert. denied, 215 Conn. 819, 576 A.2d 547 (1990), vacated on other grounds, 498 U.S. 1019, 111 S. Ct. 663, 112 L. Ed. 2d 657 (1991) (*Geisler I*); see *Marshall* v. *DelPonte,* 27 Conn. App. 346, 350, 606 A.2d 716 (1992). At Geisler's trial, no such evidence was offered, and the Appellate Court reversed the conviction on the basis of insufficient evidence.

[5] In the petition for a writ of certiorari to the United States Supreme Court, the state appealed the decision in *Geisler I* only as to the count of assault in the second degree.

state. The Appellate Court again ruled the evidence inadmissible, but this time it based its holding on state constitutional grounds. *State* v. *Geisler,* 25 Conn. App. 282, 292, 594 A.2d 985 (1991) (*Geisler II*). We then granted the state's petition for certification to review the certified issue.

In *Geisler I,* supra, 144–47, and in *Geisler II,* supra, 285, the Appellate Court detailed the facts found by the trial court at the suppression hearing. We will discuss only those facts pertinent to the issues raised here. At approximately 3 p.m. on July 24, 1986, Brunstad was driving a motorcycle westbound on Long Lots Road in Westport. At the intersection of Long Lots Road and Bayberry Lane, Brunstad and a car traveling east on Long Lots Road collided, resulting in injuries to Brunstad. As he lay injured, Brunstad watched the car turn north on Bayberry Lane. When the police arrived, Brunstad described the car as a red Peugeot station wagon, and the driver as an older man with gray hair and glasses. Brunstad also told the police that the driver had stopped, had looked back at him and then had driven away.

Officer Michael Barrett of the Westport police department arrived at the scene of the accident while emergency personnel were attending to Brunstad. Barrett observed glass debris, a piece of trim and the front grille of a Peugeot. Westport police Sergeant Leonard Rummo told Barrett that a red Peugeot station wagon had hit Brunstad and then had fled the scene. Barrett assisted with traffic control for approximately twenty minutes and then was sent to check driveways on Bayberry Lane to try to locate the red Peugeot.

Approximately one mile from the accident scene, Barrett saw a red Peugeot station wagon in a driveway. He ran a check on the vehicle's registration and obtained the defendant's name and Bayberry Lane

address. Barrett observed that the Peugeot's door was ajar with the keys in the ignition. Additionally, the left front fender was dented, the trim and the plastic front grill were missing, the left headlight was broken, and the front fender had hair fibers attached to it.

Shortly thereafter, Westport police officer Gordon Hiltz arrived at the Bayberry Lane home to assist Barrett. Hiltz noticed that the Peugeot's radiator felt warm, as if the car had been recently operated. The officers circled the house and then approached the front door. The inner door was open, but the screen door was closed. The officers rang the doorbell, knocked on the door and shouted through the screen door, but received no response. They again walked around the perimeter of the house and knocked on windows, but received no response. The officers knocked on the front door again, yelled into the house and still received no response. At this time, the officers discussed the possibility that the operator of the Peugeot might have been injured in the accident and might need assistance. At the suppression hearing, the officers testified that they had considered the following factors to be relevant in making that determination: the damage to the car; the victim's description of the driver as "older"; their belief that the driver might have been rendered unconscious or might have suffered a heart attack; and their "collective experience" as police officers. The officers entered the defendant's house without a warrant.

Once inside the house, the officers yelled "Anyone home?" into the kitchen, but received no response. From the kitchen the officers could see across a hallway into a bedroom. They saw someone lying on the bed and called out to the person. That person, the defendant, did not respond, and the officers entered the bedroom. The defendant lay fully clothed, either asleep or unconscious, and they smelled an odor of alcohol in the room.

The officers shook the defendant to awaken him and "to see if he was all right." The defendant awoke, the officers asked if he was all right, and he replied that he was. The officers observed no visible injuries, the defendant complained of none, and the officers determined that the defendant was not injured.

While still in the bedroom, Barrett asked the defendant if he had been drinking, and he responded in the affirmative. In response to the officers' questions, he admitted that the red Peugeot in the driveway belonged to him and that he had returned to his home an hour earlier.[6] The officers asked the defendant to step outside where they questioned him further and then placed him under arrest.[7] The defendant entered the patrol car and was read his *Miranda* rights.[8]

At the police station, the officers videotaped the defendant answering questions and participating in performance tests given to determine his sobriety. The police administered to the defendant, with his consent, two blood alcohol breathalyzer tests and photographed him.

On the basis of the above factual findings, the trial court determined that the officers' warrantless entry into the defendant's home was justified by exigent circumstances, namely the officers' reasonable beliefs that the defendant's life was endangered, that the defendant might attempt to flee, and that evidence might be

[6] See footnote 13, infra.

[7] At the suppression hearing, the parties stipulated that: (1) probable cause existed for the defendant's arrest; (2) the defendant was arrested without a warrant; and (3) the defendant was arrested inside his home by police officers who entered his home without a warrant. Although testimony at the hearing revealed that the defendant was, in fact, arrested outside his home, neither the state nor the defendant has raised any claim based on this inconsistency.

[8] *Miranda* v. *Arizona,* 384 U.S. 436, 86 S. Ct. 1602, 16 L. Ed. 2d 694 (1966).

destroyed.[9] The trial court further held that even if exigent circumstances did not exist, the blood alcohol results, the videotape of the defendant at the station house and the statements to the police were not "fruits of an illegal arrest," and, therefore, were admissible. The trial court then denied the motion to suppress.

In *Geisler I,* the Appellate Court reversed, holding that on the basis of the facts found by the trial court, the officers could not have reasonably believed that the defendant's life was endangered and that, therefore, the warrantless entry violated the search and seizure clause of the United States constitution.[10] The Appellate Court determined that the "emergency doctrine" type of exigency was applicable to analyze the warrantless entry into the defendant's home and that the trial court's factual findings did not support the officers' conclusions that the defendant had been injured in the accident. The Appellate Court concluded that the trial court should have granted the motion to suppress the evidence obtained subsequent to the illegal entry—that is, the defendant's statements at his home, his statements outside his home including those at the police station, the videotape and the results of the blood tests. Id., 155–56. The Appellate Court reasoned in *Geisler I* that the taint resulting from the unlawful entry into the defendant's home was not sufficiently attenuated when the evidence was obtained.

In *Geisler II,* after remand by the United States Supreme Court, the Appellate Court held that the evidence obtained at the police station would have to be suppressed under state constitutional law, even though under federal constitutional law the evidence would be

---

[9] See footnote 10, infra.

[10] On appeal, the state did not pursue the "flight" and "destruction of evidence" theories of exigency that the trial court used in its decision because the state conceded the facts of this case would not justify the warrantless entry under those theories. *Geisler I,* supra, 148.

admissible.[11] In its appeal from *Geisler II,* the state argues that the Appellate Court improperly found facts by reversing the trial court's determination that the police officers' entry was justified.

## I

Well known federal and state constitutional principles govern the exclusion of evidence derived from a warrantless entry into a home. The fourth amendment to the United States constitution[12] provides: "The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no warrants shall issue, but upon probable cause, supported by oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized." Entry by the government into a person's home, " 'is the chief evil against which the wording of the Fourth Amendment is directed.' " *Payton* v. *New York,* 445 U.S. 573, 585, 100 S. Ct. 1371, 63 L. Ed. 2d 639 (1980). *Payton*

---

[11] The Appellate Court correctly held that it could review the state constitutional claim after the United States Supreme Court vacated and remanded the case for consideration under federal constitutional law. "Even if we assume that the defendant abandoned his state constitutional claim on appeal but preserved it at the trial level our decision to review it on remand from the United States Supreme Court is consistent with our case law. In *State* v. *Barrett,* [205 Conn. 437, 534 A.2d 219 (1987)], our Supreme Court reviewed an unpreserved state constitutional claim, raised for the first time on remand from the United States Supreme Court, under the exceptional circumstances doctrine of *State* v. *Evans,* 165 Conn. 61, 327 A.2d 576 (1973), which was later refined by *State* v. *Golding,* 213 Conn. 233, 567 A.2d 823 (1989). It would be illogical to afford *Evans-Golding* review to a defendant, as the one in *Barrett,* who completely failed to preserve his state constitutional claim at the trial court but to deny review to a defendant, such as the one in this case, who preserved it at trial but failed to set forth a separate argument for it in his initial brief to this court." *State* v. *Geisler,* 25 Conn. App. 282, 284 n.2, 594 A.2d 985 (1991).

[12] The fourth amendment to the United States constitution was made applicable to the states through the fourteenth amendment's due process clause. *Wolf* v. *Colorado,* 338 U.S. 25, 27–28, 69 S. Ct. 1359, 93 L. Ed. 1782 (1949).

violations—that is, warrantless searches and seizures inside a home, are "presumptively unreasonable"; id., 586; and the state bears the burden of showing that an exception to the warrant requirement exists. Id., 586 n.25; *State* v. *Zindros,* 189 Conn. 228, 237, 456 A.2d 288 (1983), cert. denied, 465 U.S. 1012, 104 S. Ct. 1014, 79 L. Ed. 2d 244 (1984). "[A]bsent consent to entry or exigent circumstances, a judicial determination of probable cause must stand in between the police and the door of a person's home, whether the object of an entry is to search and seize or to arrest." *State* v. *Ruth,* 181 Conn. 187, 193, 435 A.2d 3 (1980). To discourage unreasonable searches and seizures, the evidence obtained as a direct result of that illegal search or seizure, as well as the "fruits," or evidence derived therefrom, are excluded from evidence, unless the connection between the "fruits" and the illegal search has been sufficiently attenuated to be purged of its primary taint. *Segura* v. *United States,* 468 U.S. 796, 804–805, 104 S. Ct. 3380, 82 L. Ed. 2d 599 (1984).

In 1990, the United States Supreme Court in *New York* v. *Harris,* supra, narrowed the exclusionary rule in illegal warrantless home arrest situations so that evidence obtained away from the home incident to the arrest need not be suppressed if the police officers had probable cause to make the warrantless arrest. Id., 18. The court held that "the exclusionary rule does not bar the State's use of a statement made by the defendant outside of his home, even though the statement is taken after an arrest made in the home in violation of *Payton.*" Id., 21. In its analysis, the court in *Harris* distinguished "fruit of the poisonous tree" cases, which are analyzed by determining whether the evidence obtained is sufficiently divorced from the underlying illegality. It held that "attenuation analysis is only appropriate where, as a threshold matter, courts determine that 'the challenged evidence is in some sense the

product of illegal governmental activity.' " Id., 19, quoting *United States* v. *Crews,* 445 U.S. 463, 471, 100 S. Ct. 1244, 63 L. Ed. 2d 537 (1980). Because the arresting officers in *Harris* had probable cause to arrest the defendant and because the statement at issue had been made while the defendant was lawfully detained at the police station, the court held that the statement was "not the product of being in unlawful custody. Neither was it the fruit of having been arrested in the home rather than someplace else." *New York* v. *Harris,* supra.

Accordingly, if we were to follow *Harris* in interpreting our state constitution, the videotape, the blood alcohol results and the statements made by the defendant at the police station would be admissible into evidence because they were obtained while the defendant was in lawful custody at the police station and would not constitute "fruits" of the illegal entry into the dwelling. This court has not previously addressed this important question of state constitutional law.

In *Geisler II,* on remand from the United States Supreme Court, the Appellate Court held that the federal exclusionary rule, as narrowed by *Harris,* does not protect Connecticut citizens to the extent that the state constitution requires because it does not sufficiently deter police from entering a home without a warrant. *Geisler II,* supra, 290. In rejecting the United States Supreme Court's abandonment in *Harris* of the attenuation analysis, the Appellate Court reasoned that "such an analysis is appropriate in order to determine whether there is a temporal and causal connection between the entry into the home and the particular evidence later obtained outside the home. Here, the state has conceded that the time between the defendant's arrest in the home and the defendant's station house statements and consent to take the intoximeter texts was minimal. [*Geisler I*], supra, 156. Furthermore,

there were no intervening circumstances to break the causal connection between the warrantless entry into the home and the evidence in question. Id., 157." *Geisler II,* supra, 290.[13]

It is well established that "federal constitutional and statutory law 'establishes a minimum national standard for the exercise of individual rights and does not inhibit state governments from affording higher levels of protection for such rights.' . . . *Cologne* v. *Westfarms Associates,* 192 Conn. 48, 57, 469 A.2d 1201 (1984)." *State* v. *Barton,* 219 Conn. 529, 546, 594 A.2d 917 (1991). Justice Shea, when writing for an unanimous en banc court in *State* v. *Marsala,* 216 Conn. 150, 159–60, 579 A.2d 58 (1990), rejected the "good faith" exception to the exclusionary rule adopted by the United States Supreme Court in *United States* v. *Leon,* 468 U.S. 897, 104 S. Ct. 3405, 82 L. Ed. 2d 677 (1984), and noted that "[w]e have frequently relied upon decisions of the United States Supreme Court interpreting the fourth amendment, as well as other amendments to the United States constitution, to define the contours of the protections provided in the various sections of the declaration of rights contained in our state constitution. We have also, however, determined in some instances that the protections afforded to the citizens of this state by our own constitution go beyond those provided by the federal constitution, as that document has been interpreted by the United States Supreme Court. *State* v. *Dukes,* 209 Conn. 98, 112, 547 A.2d 10 (1988); *State* v. *Stoddard,* 206 Conn. 157, 166, 537 A.2d 446 (1988); *State* v. *Kimbro,* 197 Conn. 219, 235–36, 496 A.2d 498 (1985)."

In order to construe the contours of our state constitution and reach reasoned and principled results, the

[13] No one questions that, even under *New York* v. *Harris,* 495 U.S. 14, 110 S. Ct. 1640, 109 L. Ed. 2d 13 (1990), the statements made by the defendant in his home after an illegal entry would be inadmissible.

following tools of analysis should be considered to the extent applicable: (1) the *textual approach;* see, e.g., *Stolberg* v. *Caldwell,* 175 Conn. 586, 597–98, 402 A.2d 763 (1978), appeal dismissed sub nom. *Stolberg* v. *Davidson,* 454 U.S. 958, 102 S. Ct. 496, 70 L. Ed. 2d 374 (1981) ("Unless there is some clear reason for not doing so, effect must be given to every part of and each word in the constitution."); (2) *holdings and dicta of this court, and the Appellate Court;* see, e.g., *Doe* v. *Maher,* 40 Conn. Sup. 394, 448–49, 515 A.2d 134 (1986) (trial court used strict scrutiny to analyze sex discrimination claim based on the equal protection clause of the state constitution, relying, in part, on dicta from the Connecticut Supreme Court regarding what standard would be used once Connecticut's equal rights amendment was adopted); (3) *federal precedent;* see, e.g., *State* v. *Lamme,* 216 Conn. 172, 184, 579 A.2d 484 (1990) ("The adoption of federal constitutional precedents that appropriately illuminate open textured provisions in our own organic document in no way compromises our obligation independently to construe the provisions of our state constitution."); (4) *sister state decisions* or sibling approach; see, e.g., *State* v. *Gethers,* 197 Conn. 369, 386–87, 497 A.2d 408 (1985); *Cologne* v. *Westfarms Associates,* supra, 58–59; (5) the *historical approach,* including the historical constitutional setting and the debates of the framers; see, e.g., *State* v. *Lamme,* supra, 178–80; *Cologne* v. *Westfarms Associates,* supra, 60–62; *Palka* v. *Walker,* 124 Conn. 121, 126, 198 A. 265 (1938); and (6) *economic/sociological considerations.* See *State* v. *Barton,* supra, 546; *State* v. *Dukes,* supra, 115; see generally *State* v. *Jewett,* 146 Vt. 221, 500 A.2d 233 (1985); M. Margulies, "Connecticut's Free Speech Clauses: A Framework and an Agenda," 65 Conn. B.J. 437 (1991) (an analytical framework for state constitutional analysis in the context of the free speech clauses);

E. Peters, "State Constitutional Law: Federalism in the Common Law Tradition," 84 Mich. L. Rev. 583 (1986) (book review).

Article first, § 7 of the Connecticut constitution, which is similar, but not identical, to the fourth amendment, provides: "The people shall be secure in their persons, houses, papers and possessions from unreasonable searches or seizures; and no warrant to search any place, or to seize any person or things, shall issue without describing them as nearly as may be, nor without probable cause supported by oath or affirmation." In order to give meaning to the independent vitality of our state search and seizure clause, we made clear in *State* v. *Dukes,* supra, 110, that the exclusionary rule bars evidence obtained in violation of our state constitution. We recognized that the "exclusionary rule is now widely recognized as an effective remedy for enforcement of the constitutional protection against unconstitutional searches and seizures." Id.

In determining that the exclusionary rule should be invoked to suppress evidence under the state constitution, we are mindful of the costs to society that result from excluding such evidence. Nonetheless, just as we rejected those costs as being insufficient to outweigh the constitutional necessity of excluding evidence in *State* v. *Marsala,* supra, 165, so we come to the same conclusion in the present case. Justice Thurgood Marshall, in his dissent in *Harris,* points out the practical considerations that weigh heavily in favor of excluding evidence that is obtained as a result of an illegal entry into the home. "[T]he officer knows that if he breaks into the house without a warrant and drags the suspect outside, the suspect, shaken by the enormous invasion of privacy he has just undergone, may say something incriminating. Before today's decision, the government would only be able to use that evidence if the Court found that the taint of the arrest had been

attenuated; after the decision, the evidence will be admissible regardless of whether it was the product of the unconstitutional arrest. . . . The Court thus creates powerful incentives for police officers to violate the Fourth Amendment. In the context of our constitutional rights and the sanctity of our homes, we cannot afford to presume that officers will be entirely impervious to these incentives." *New York* v. *Harris,* supra, 32. We do not believe that our state constitution allows us to overlook these consequences.

The sanctity of the home has a well established place in our jurisprudence. The English common law, upon which much of this country's constitutional and common law is based, recognized that intrusion into the home constituted especially egregious conduct. "From earliest days, the common law drastically limited the authority of law officers to break the door of a house to effect an arrest. Such action invades the precious interest of privacy summed up in the ancient adage that a man's house is his castle. As early as the 13th Yearbook of Edward IV (1461–1483), at folio 9, there is a recorded holding that it was unlawful for the sheriff to break the doors of a man's house to arrest him in a civil suit in debt or trespass, for the arrest was then only for the private interest of a party. Remarks attributed to William Pitt, Earl of Chatham, on the occasion of debate in Parliament on the searches incident to the enforcement of an excise on cider, eloquently expressed the principle: 'The poorest man may in his cottage bid defiance to all the forces of the crown. It may be frail; its roof may shake; the wind may blow through it; the storm may enter; the rain may enter; but the King of England cannot enter—all his force dares not cross the threshold of the ruined tenement!' " *Miller* v. *United States,* 357 U.S. 301, 306–307, 78 S. Ct. 1190, 2 L. Ed. 2d 1332 (1958). In discussing burglary, defined as "nocturnal house-breaking," Black-

stone wrote, "[a]nd the law of England has so particular and tender a regard to the immunity of a man's house, that it styles it his castle, and will never suffer it to be violated with impunity . . . ." 4 Blackstone's Commentaries (1822) p. 222.

The Connecticut constitution that was adopted in 1818 contained in article first, § 8 the search and seizure clause that is currently found in article first, § 7 of the 1965 state constitution. Before the fourth amendment's search and seizure clause was made applicable to the states, much less the exclusionary rule, this court recognized the limits imposed on the government by the Connecticut search and seizure clause. "The common law was ready to supply a remedy for any unreasonable search or seizure, by an action of trespass against the individuals who made it. Our Declaration of Rights would be meaningless if it did not seek to do more than this. Its guaranties were designed to protect the citizen against the State . . . and to do so in a way that would repress the wrongful act most efficiently. . . . If the constitutional guaranty now under consideration is to be liberally interpreted in favor of the citizen, it would be difficult to apply the principle of such decisions to criminal prosecutions, supported by proof of papers illegally seized for that purpose, in the defendant's house, by public officers acting professedly as such, without seeming to allow the State to profit by its own wrong. . . . Whether its seizure would have been, under the circumstances, unreasonable . . . presents a question of the utmost gravity, in its bearing, on the one hand, upon the methods of detecting crime, and on the other, upon the liberty of the individual and the *inviolability of home.*" (Emphasis added.) *State* v. *Griswold,* 67 Conn. 290, 310–11, 34 A. 1046 (1896) (*Baldwin, J.,* concurring). Indeed, the adoption of the state's search and seizure clause in our state constitution was made in the context that

its federal counterpart's main thrust was not only protection from the general warrant but also applied " 'to all invasions on the part of the government and its employe[es] of the sanctity of a [person's] home and the privacies of life.' " *Payton* v. *New York,* supra, 585, quoting *Boyd* v. *United States,* 116 U.S. 616, 630, 6 S. Ct. 524, 29 L. Ed. 746 (1886).

Although not rooted in state constitutional law, we recently demonstrated our concern for the privacy of the individual when we concluded that a homeless man has a reasonable expectation of privacy in his duffel bag and cardboard box because, inter alia, they were located in a place that he regarded as his home. *State* v. *Mooney,* 218 Conn. 85, 111, 588 A.2d 145, cert. denied,     U.S.     , 112 S. Ct. 330, 116 L. Ed. 2d 270 (1991); see also *French* v. *Amalgamated Local Union 376,* 203 Conn. 624, 630, 526 A.2d 861 (1987) (acknowledging inherent conflict between sanctity of home and principle of freedom of speech implicated in legislation restricting residential picketing); *State* v. *Gallagher,* 191 Conn. 433, 442, 465 A.2d 323 (1983) (privilege to resist unlawful warrantless intrusion into the home exists in some circumstances); *State* v. *Santiago,* 26 Conn. App. 481, 489–90, 602 A.2d 40, cert. granted, 221 Conn. 920, 608 A.2d 686 (1992) ("A porch is intrinsically associated with both the sanctity of the home and the privacies of life. . . . [It] is as sacrosanct as the home itself . . . ."). Only recently, when we extended to the overnight guest the common law privilege to resist an unlawful police entry into the bedroom he occupied, we emphasized the importance of the right of privacy in the home. We held that the right to be secure in one's home, "unequivocally establishes the proposition that [a]t the very core [of the Fourth Amendment] stands the right of a man to retreat into his own home and there be free from unreasonable governmental intrusion. *Silverman* v. *United States,* 365

U.S. 505, 511 [81 S. Ct. 679, 5 L. Ed. 2d 734 (1961)]. *Payton* v. *New York,* supra, 589–90. The right of officers to thrust themselves into a home is . . . a grave concern, not only to the individual but to a society which chooses to dwell in reasonable security and freedom from surveillance. *Johnson* v. *United States,* 333 U.S. 10, 14, 68 S. Ct. 367, 92 L. Ed. 436 (1948)." (Internal quotation marks omitted.) *State* v. *Brosnan,* 221 Conn. 788, 806–807, 608 A.2d 49 (1992).

Finally, the New York Court of Appeals, when *Harris* returned to that court on remand from the decision of the United States Supreme Court, also rejected that court's analysis under the New York constitution. The Court of Appeals concluded in *People* v. *Harris,* 77 N.Y.2d 434, 570 N.E.2d 1051, 568 N.Y.S.2d 702 (1991), "that the Supreme Court's [*Harris*] rule does not adequately protect the search and seizure rights of [the] citizens of New York." Id., 437. The court held that under the New York constitution, "statements obtained from an accused following a *Payton* violation must be suppressed unless the taint resulting from the violation has been attenuated." Id.

We, therefore, conclude that the *Harris* rationale falls short of the protection required under our state constitution. Accordingly, we agree with the Appellate Court that the exclusionary rule under article first, § 7 requires that evidence derived from an unlawful warrantless entry into the home be excluded unless the taint of the illegal entry is attenuated by the passage of time or intervening circumstances.

## II

We must next determine whether the Appellate Court correctly decided that the warrantless entry into the home was not justified by an exception. The emergency doctrine is one of the recognized exceptions to the federal constitutional requirement that searches

and seizures be conducted pursuant to a warrant. See *Mincey* v. *Arizona,* 437 U.S. 385, 392, 98 S. Ct. 2408, 57 L. Ed. 2d 290 (1978). "[T]he fourth amendment does not bar police officers, when responding to emergencies, from making warrantless entries into premises and warrantless searches when they reasonably believe that a person within is in need of immediate aid. . . . The extent of the search is limited, involving 'a prompt warrantless search of the area to see if there are other victims or if a killer is still on the premises.' . . . The police may seize any evidence that is in plain view during the course of the search pursuant to the legitimate emergency activities. . . . Such a search is strictly circumscribed by the emergency which serves to justify it . . . and cannot be used to support a general exploratory search." (Citations omitted.) *State* v. *Magnano,* 204 Conn. 259, 266, 528 A.2d 760 (1987).

Just as the commands of the fourth amendment are not absolute, neither are those of article first, § 7 of the state constitution. We recognize, therefore, that exceptions to the warrant requirement, such as an emergency, is an exception to the state constitution as well as the federal constitution. Such an exception is well grounded in the common law. Blackstone recognized a similar exception to the "house is a castle" principle in criminal cases where "the public safety supersedes the private." 4 Blackstone's Commentaries (1822) p. 223.

Nevertheless, the emergency doctrine does not give the state an unrestricted invitation to enter the home. "[G]iven the rationale for this very limited exception, the state actors making the search must have reason to believe that life or limb is in immediate jeopardy and that the intrusion is reasonably necessary to alleviate the threat." *Good* v. *Dauphin County Social Services,* 891 F.2d 1087, 1094 (3d Cir. 1989).[14] The police, in

[14] For example, the following decisions have approved warrantless entries and searches under the emergency doctrine: *People* v. *Thompson,* 770 P.2d

order to avail themselves of this exception, must "have valid reasons for the belief that an emergency exists, a belief that must be grounded in empirical facts rather than subjective feelings . . . ." *People* v. *Mitchell,* 39 N.Y.2d 173, 178, 347 N.E.2d 607, 383 N.Y.S.2d 246, cert. denied, 426 U.S. 953, 96 S. Ct. 3178, 49 L. Ed. 2d 1191 (1976). It is an objective and not a subjective test. The test is not whether the officers actually believed that an emergency existed, but whether a reasonable officer would have believed that such an emergency existed. *State* v. *Klauss,* 19 Conn. App. 296, 302, 562 A.2d 558 (1989); see *State* v. *Guertin,* 190 Conn. 440, 453, 461 A.2d 963 (1983) (adopting objective test for warrantless felony arrest exigency analysis); see also *United States* v. *Zabare,* 871 F.2d 282, 291 (2d Cir. 1989) (test for determining whether a warrantless entry was justified by exigent circumstances is an objective one).

## III

In making our determination as to whether the warrantless search was justified under the emergency doctrine exception to our state search and seizure clause, a two-part analysis is required. First, we must determine the proper standard of review the appellate courts should apply when analyzing trial court decisions involving the emergency doctrine exception and, second,

---

1282 (Colo. 1989) (responding to anonymous report of domestic dispute, police saw shell casings, blood on porch, broken glass in front door and woman inside house covered with blood); *Arango* v. *State,* 411 So. 2d 172 (Fla. 1982) (police received telephone call of disturbance at apartment; police saw broken glass on walkway and bullet hole in window and received no response after knocking); *People* v. *Mitchell,* 39 N.Y.2d 173, 347 N.E.2d 607, 383 N.Y.S.2d 246, cert. denied, 426 U.S. 953, 96 S. Ct. 3178, 49 L. Ed. 2d 1191 (1976) (after questioning hotel residents and searching hotel and all rooms except occupied ones for missing woman, police searched occupied rooms on floor where woman was last seen); *La Fournier* v. *State,* 91 Wis. 2d 61, 280 N.W.2d 746 (1979) (anonymous telephone call of drug overdose); see also 1 W. LaFave, Search and Seizure (2d Ed. 1987 and Sup. 1991) § 6.6 (a).

whether the trial court's decision passes muster under that standard of review. Although the Appellate Court did not explicitly state the standard of review that it used in *Geisler I* or in *Geisler II,* we conclude that it correctly analyzed the issue of the applicability of the emergency doctrine by making a de novo review, based upon the subordinate facts found by the trial court, to determine whether an emergency existed that would justify the warrantless entry into the dwelling.

Facts found by the trial court will not be disturbed unless the finding is clearly erroneous. Practice Book § 4061; *State* v. *Torres,* 197 Conn. 620, 625, 500 A.2d 1299 (1985). Conclusions drawn from those underlying facts must be legal and logical. *State* v. *Lasher,* 190 Conn. 259, 267, 460 A.2d 970 (1983). An appellate court reviews conclusions based upon subordinate facts found, even if labeled conclusions of fact, to the same extent that it reviews conclusions of law. *Hadfield* v. *Tracy,* 101 Conn. 118, 125, 125 A. 199 (1924). Because the issue of the warrantless entry into a person's home involves his or her constitutional rights, a reviewing court must examine the record thoroughly to determine whether the subordinate facts justify the trial court's conclusion that the officers' belief that an emergency existed was reasonable. *State* v. *Howard,* 221 Conn. 447, 454, 604 A.2d 1294 (1992); see *State* v. *Frazier,* 185 Conn. 211, 219, 440 A.2d 916 (1981), cert. denied, 458 U.S. 1112, 102 S. Ct. 3496, 73 L. Ed. 2d 1375 (1982). Thus, we must determine, whether on the facts found by the trial court, the Appellate Court correctly concluded that the officers' conclusion that there was an emergency was unreasonable.

The state relies on *State* v. *Reagan,* 209 Conn. 1, 546 A.2d 839 (1988), in arguing that the clearly erroneous standard of review should apply both to the subordinate

facts found by the trial court and to the trial court's ultimate conclusion that there was an emergency that justified the warrantless entry. In that case, the trial court, ruling on a motion to suppress, held that exigent circumstances justified a warrantless entry into the defendant's home. On appeal, the Appellate Court held that the defendant's wife had consented to the entry, even though the issue of consent had not been raised before the trial court at the suppression hearing. On certification, we stated that whether consent to a search is voluntary is " 'a question of fact to be determined from the totality of all the circumstances.' " Id., 7–8, quoting *Schneckloth* v. *Bustamonte,* 412 U.S. 218, 227, 93 S. Ct. 2041, 36 L. Ed. 2d 854 (1973). Our holding in *Reagan,* however, must be viewed in the context of the issue that was then before us. The Appellate Court therein had concluded that there was consent without the benefit of the trial court's finding of subordinate facts. We made it clear that the facts underlying a finding of consent are subordinate facts. *State* v. *Reagan,* supra, 14. We did not discuss the standard of review in the context of a trial court's conclusion of consent because the trial court had not made such a finding. Thus, we regard *Reagan* as inapposite to the appropriate standard of review.

We hold, therefore, that in reviewing a trial court's ruling on the emergency doctrine, subordinate factual findings will not be disturbed unless clearly erroneous and the trial court's legal conclusion regarding the applicability of the emergency doctrine in light of these facts will be reviewed de novo.[15]

---

[15] Other courts also review de novo the trial court's ultimate conclusion on a motion to suppress. See *United States* v. *Uribe-Velasco,* 930 F.2d 1029, 1032 (2d Cir. 1991) (historical facts, e.g., what information officers had, what officers did, upheld unless clearly erroneous; legal issues, e.g., whether information sufficed to give officers reasonable suspicion or probable cause, reviewed de novo); *United States* v. *George,* 883 F.2d 1407, 1411 (9th Cir. 1989) (findings of fact reviewed for clear error; ultimate legal conclusions

Without disturbing the trial court's undisputed factual findings, the Appellate Court held that the police officers' belief that the defendant was in need of immediate aid was not reasonable, and reversed the trial court. *Geisler I,* supra, 154. We agree with the Appellate Court that the trial court's factual findings do not support the conclusion that it was reasonable to believe that an emergency existed.

In the present case, the facts available to the police officers were the minor damage to the car, the key left in the ignition, the open car door and the lack of a response when the officers rang the doorbell, knocked on the door and windows and shouted through the screen. Those facts could not reasonably lead to the conclusion that the driver might have suffered the type of injury that would require emergency aid. See *People* v. *Krueger,* 208 Ill. App. 3d 897, 567 N.E.2d 717 (1991) (emergency doctrine cannot justify warrantless entry where trial court found that police knew that defendant had been involved in accident, that defendant was sleeping, and that defendant was "out of it" but fine); *Lambert* v. *State,* 745 P.2d 1185 (Okla. Crim. App. 1987) (emergency doctrine did not justify warrantless entry even where the trial court found the automobile of the defendant severely damaged, but the defendant walked to a nearby farmhouse in order to obtain a ride home, and at his home, in response to a police inquiry, he said he was all right).

Indeed, in the present case, even if the police had been justified initially in entering the defendant's home, once they ascertained that he was physically well they should have withdrawn. Upon being awakened, the defendant responded to the police officer that he was

of probable cause and exigent circumstances reviewed de novo); *State* v. *Halla-Poe,* 468 N.W.2d 570, 572 (Minn. App. 1991) (appellate court must determine whether as a matter of law officers were justified to enter under the emergency doctrine).

all right, the officers observed no visible injuries and they determined that he was not injured. See *State* v. *Magnano,* supra; *Lambert* v. *State,* supra.

We conclude, therefore, that the Appellate Court applied the correct standard of review to the trial court's decision on the motion to suppress and also correctly ruled that the facts did not justify a reasonable belief that an emergency existed. Accordingly, we hold that the Connecticut constitution requires the suppression of evidence obtained not only inside the defendant's home but also the evidence obtained outside the home, including the blood alcohol results, the defendant's statements at the station house and the videotape of the defendant at the station house.

The judgment of the Appellate Court is affirmed.[16]

In this opinion PETERS, C. J., SHEA and GLASS, Js., concurred.

COVELLO, J., dissenting. I believe that the outcome of this case should be governed by the United States Supreme Court's holding in *New York* v. *Harris,* 495 U.S. 14, 110 S. Ct. 1640, 109 L. Ed. 2d 13 (1990). The cases are virtually indistinguishable. As here, in *Harris,* the police arrested the defendant in his home without a warrant. As here, the police had probable cause to do so. As here, Harris sought the suppression of evidence obtained at the police station following his arrest.

The United States Supreme Court concluded that the fourth amendment to the United States constitution did not require suppression of the subsequently obtained evidence. Since the police had probable cause to take the defendant into custody, the Supreme Court reasoned that the later acquired evidence was obtained

---

[16] We emphasize that our decision in this case rests on article first, § 7 of the Connecticut constitution. See *Michigan* v. *Long,* 463 U.S. 1032, 1041–42, 103 S. Ct. 3469, 77 L. Ed. 2d 1201 (1983).

while the accused was being legally detained and, therefore, the unwarranted entry into the defendant's home did not require the suppression of this otherwise admissible evidence.

Wisely, the majority does not even attempt to distinguish either the facts of the two cases or the language of the controlling constitutional provisions.[1] Further, there is no historical basis for construing this language differently. I submit, therefore, that the holding in *Harris* should control the outcome here.

Despite their compelling similarities, the majority, nevertheless, rejects this view and under the aegis of our state constitution, prevents those who are to determine the defendant's guilt or innocence from learning critical, relevant facts; in this instance, time sensitive evidence of the defendant's blood alcohol level and video tapes of his physical condition shortly following the accident.

"Although in interpreting the Connecticut constitution we have agreed with and followed the federal handling of consonant provisions of the federal constitution"; *State* v. *Dukes,* 209 Conn. 98, 113, 547 A.2d 10 (1988); I agree with the majority that "in a proper case 'the law of the land' may not, in state constitutional context, also be 'the law of the state of Connecticut.' " Id., 113–14. In doing so, however, in the absence of textual distinctions, we have primarily relied

---

[1] The fourth amendment to the United States constitution provides: "The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no warrants shall issue, but upon probable cause, supported by oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized."

Article first, § 7 of the Connecticut constitution provides: "The people shall be secure in their persons, houses, papers and possessions from unreasonable searches or seizures; and no warrant to search any place, or to seize any person or things, shall issue without describing them as nearly as may be, nor without probable cause supported by oath or affirmation."

upon our historical antecedents as the basis for arriving at a contrary result. See, e.g., *State* v. *Barton,* 219 Conn. 529, 538 n.4, 594 A.2d 917 (1991); *State* v. *Lamme,* 216 Conn. 172, 179, 579 A.2d 484 (1990); *Cologne* v. *Westfarms Associates,* 192 Conn. 48, 60–62, 469 A.2d 1201 (1984); *Palka* v. *Walker,* 124 Conn. 121, 126, 198 A. 265 (1938).

"This court has never viewed constitutional language as newly descended from the firmament like fresh fallen snow upon which jurists may trace out their individual notions of public policy uninhibited by the history which attended the adoption of the particular phraseology at issue and the intentions of its authors." *Cologne* v. *Westfarms Associates,* supra, 62.

In examining the purported historical antecedents of article first, § 7 of the Connecticut constitution, the majority refers to the 13th Yearbook of Edward IV (1461-1483), at folio 9, "[r]emarks attributed to William Pitt, Earl of Chatham, on the occasion of debate in [the British] Parliament . . . " and comments found in 4 Blackstone's Commentaries (1822), p. 222. I submit that the assertions of our English forbearers are applicable equally to the entire body of American jurisprudence and serve no particular purpose in illuminating the unique antecedents of Connecticut's constitution.

The conferring of greater rights upon the individual always carries greater costs to society, including the diminution of the powers of those in law enforcement which are aimed at promoting the public good by the prevention of crime. *State* v. *Dukes,* supra, 106. "I believe that due process fairness, under our state as well as our federal constitution, must take into account the 'felt necessities of the time'; O. W. Holmes, Jr., The Common Law (1881) p. 1; one of which is the magnitude of our crime problem." *State* v. *Stoddard,* 206

Conn. 157, 182, 537 A.2d 446 (1988) (*Shea, J.*, dissenting). I would not, therefore, place this further restriction upon the admissibility of relevant evidence.

Accordingly, I dissent.