### STATE OF CONNECTICUT *v.* TERENCE TRINE
### (13194)

O'CONNELL, LAVERY and HEIMAN, Js.

Argued November 29, 1994—decision released April 18, 1995

*Dominic S. Piacenza,* for the appellant (defendant).

*Kevin T. Kane,* assistant state's attorney, with whom, on the brief, was *C. Robert Satti, Sr.,* state's attorney, for the appellee (state).

HEIMAN, J. The defendant appeals from a judgment of conviction, rendered after a conditional plea of nolo contendere,[1] of possession of a narcotic substance with intent to sell in violation of General Statutes § 21a-277 (a).[2] On appeal, the defendant claims that the trial court improperly denied his motion to suppress evidence that was seized without a warrant under circumstances that required a proper warrant. We agree with the defendant that the evidence seized should have been suppressed.

The facts necessary to a proper resolution of this appeal may be briefly summarized as follows. On March 26, 1993, Officers James Cash and Steven Sinagra of the statewide narcotics task force, a police squad consisting of officers of the Connecticut state and local police, applied for a search warrant authorizing the search of the person and residence of Marybeth Montesi. Partially on the basis of information given to them by two confidential informants, the officers stated that they had reason to believe that Montesi was involved in the sale of cocaine from her home in East Lyme. The warrant was issued the same day and

---

[1] Practice Book § 4003 provides in pertinent part: "(a) When a defendant, prior to the commencement of trial, enters a plea of nolo contendere conditional on the right to take an appeal from the court's denial of the defendant's motion to suppress evidence based on an unreasonable search or seizure . . . the defendant after the imposition of sentence may file an appeal within the time prescribed by law. The issue to be considered in such appeal shall be limited to whether it was proper for the court to have denied the motion to suppress . . . ." See also General Statutes § 54-94a.

[2] General Statutes § 21a-277 (a) provides in pertinent part: "Any person who manufactures, distributes, sells, prescribes, dispenses, compounds, transports with the intent to sell or dispense, possesses with the intent to sell or dispense, offers, gives or administers to another person any controlled substance which is a hallucinogenic substance other than marijuana, or a narcotic substance, except as authorized in this chapter . . . [shall be punished]."

entitled the officers to search Montesi's person and residence for various items common to trafficking in narcotics, including weapons and handguns.

That afternoon, the team assigned to execute the search warrant met for a preraid briefing. Sergeant Lawrence Pagan, a member of the Connecticut state police with fifteen years experience as a state police officer and three years experience as the sergeant in charge of the eastern division of the statewide narcotics task force, led the team. Pagan was familiar with the contents of the affidavits used in connection with the application for the search warrant and was aware that those affidavits indicated a probability of weapons being found at the scene of the search. He was also aware that the warrant application sought an order of nondisclosure of the warrant and affidavits, alleging that there existed a risk that Montesi or an associate might seek reprisals against the confidential informants that had been the source of the information on which the application was predicated.

At approximately 3 p.m., the task force arrived at Montesi's home. Because of the home's location, the task force was unable to conduct surveillance of the area without discovery. As a consequence, the officers were unable to ascertain who or how many persons might be present on the premises when the warrant was executed.

The officers gained entrance to the premises by use of a battering ram and entered with their weapons drawn. Pagan was the second officer to enter the premises, and he observed that three persons were present: two men and one woman. Pagan immediately directed his attention to the man closest to him, later identified as the defendant. Pagan ordered the defendant to lie down on the floor on his stomach with his hands behind his head. The defendant complied with the officer's

direction. Pagan holstered his weapon and handcuffed the defendant with his arms behind his back. He then patted down the defendant for the purpose of discovering whether the defendant was carrying a weapon. The search revealed that the defendant was not armed.

In the course of conducting his patdown of the defendant, Pagan felt a hard object in the area of the right front pocket of the defendant's blue jeans and simultaneously heard a sound made by plastic. Pagan immediately concluded that the object that he felt was rock cocaine on the basis of his knowledge that rock cocaine was hard and often kept in small plastic bags, like the object that he felt in the defendant's pocket. Pagan reached into the defendant's pocket, seized the object and arrested him for a narcotics violation. It was later discovered that the bag recovered from the defendant's pocket contained approximately one ounce of rock cocaine.

The defendant asserts that the cocaine seized from his pocket was obtained in violation of article first, § 7, of the Connecticut constitution[3] and, therefore, should have been suppressed. The state, however, urges us to adopt the United States Supreme Court holding in *Minnesota* v. *Dickerson*, 508 U.S. 366, 113 S. Ct. 2130, 124 L. Ed. 2d 334 (1993), which permits law enforcement officers to seize, without a warrant, that which is determined to be contraband on the basis of an officer's sense of touch during a legal patdown search of a suspect for weapons. The dispositive issue in this appeal is, therefore, whether the constitution of Connecticut, article first, § 7, contains sufficient elasticity to permit a new exception to the search warrant

---

[3] Article first, § 7, of the Connecticut constitution provides: "The people shall be secure in their persons, houses, papers and possessions from unreasonable searches and seizures; and no warrant to search any place, or to seize any person or things, shall issue without describing them as nearly as may be, nor without probable cause supported by oath or affirmation."

requirement similar to that created by the United States Supreme Court when it concluded that a "plain feel" exception was not violative of the fourth amendment to the constitution of the United States.[4] We agree with the defendant that adoption of such a rule would be "incompatible with the fundamental precepts underlying [the constitution of Connecticut] article first, § 7." *State* v. *Miller*, 29 Conn. App. 207, 223, 614 A.2d 1229 (1992), aff'd, 227 Conn. 363, 630 A.2d 1315 (1993).

We begin our analysis by restating the principles that govern the relationship between our state constitution and the federal constitution. "It is well established that federal constitutional . . . law establishes a minimum national standard for the exercise of individual rights and does not inhibit state governments from affording higher levels of protection for such rights. . . ." (Citations omitted; internal quotation marks omitted.) *State* v. *Oquendo*, 223 Conn. 635, 649, 613 A.2d 1300 (1992). "[W]e may [therefore] find greater protection of individual rights under our state constitution than that provided by the federal constitution." *State* v. *Miller*, 227 Conn. 363, 379, 630 A.2d 1315 (1993).

"[I]n the area of fundamental civil liberties—which includes all protections of the declaration of rights contained in article first of the Connecticut constitution—we sit as a court of last resort [subject to the review of our decision only by our Supreme Court]. . . . In such constitutional adjudication, our first referent is

---

[4] The fourth amendment to the United States constitution, which was made applicable to the states in *Wolf* v. *Colorado*, 338 U.S. 25, 27–28, 69 S. Ct. 1359, 93 L. Ed. 1782 (1949), provides: "The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized."

Connecticut law and the full panoply of rights Connecticut citizens have come to expect as their due. Accordingly, decisions of the United States Supreme Court defining fundamental rights are persuasive authority to be afforded respectful consideration, but they are to be followed by Connecticut courts only when they provide no less individual protection than is guaranteed by Connecticut law." (Internal quotation marks omitted.) Id., 379–80.

"Although our state constitutional decisional law is in its infancy, some distinct, principled jurisprudential theories are emerging for determining when it is appropriate to invoke our state constitution and to afford greater protections to Connecticut residents than those supplied by the United States Supreme Court's interpretations of consonant provisions of the federal constitution. Although the basis for departure is perhaps most obvious where either the text or the historical setting of the Connecticut constitutional provision at issue varies materially from that of its federal counterpart, our courts have in some instances interpreted our state constitutional provisions more broadly than their federal counterparts even where, as is the case with the search and seizure provisions of the two documents, there is no material difference between either the texts or the historical backgrounds of the two provisions. . . . This has been particularly so where the United States Supreme Court has created exceptions to or deviated from rules previously enunciated by it . . . that are incompatible with the fundamental precepts underlying article first, § 7." (Citations omitted; internal quotation marks omitted.) *State* v. *Miller*, supra, 29 Conn. App. 222–23 (holding that warrantless searches of impounded automobiles violate Connecticut constitution despite United States Supreme Court holding in *Chambers* v. *Maroney*, 399 U.S. 42, 90 S. Ct. 1975, 26 L. Ed. 2d 419 [1970]); see also *State*

v. *Geisler*, 222 Conn. 672, 695, 610 A.2d 1225 (1992) (holding that emergency exception to warrant requirements recognized under federal constitution would be adopted by state but in more limited form); *State* v. *Marsala*, 216 Conn. 150, 151, 579 A.2d 58 (1990) (holding that good faith exception to exclusionary rule recognized under federal constitution inimical to purposes of state constitution). We believe that this is such a case.

Our cases have consistently held that both the state and federal constitution evince a preference for warrants to protect the individual rights of our citizens. "It is a cardinal principle that searches conducted outside the judicial process, without prior approval by judge or magistrate, are *per se* unreasonable . . . subject only to a few specifically established and well-delineated exceptions." (Emphasis in original; internal quotation marks omitted.) *State* v. *Miller*, supra, 29 Conn. App. 217, quoting *Mincey* v. *Arizona*, 437 U.S. 385, 390, 98 S. Ct. 2408, 57 L. Ed. 2d 290 (1978), and *Katz* v. *United States*, 389 U.S. 347, 357, 88 S. Ct. 507, 19 L. Ed. 2d 576 (1967); see also *State* v. *Lewis*, 220 Conn. 602, 609, 600 A.2d 1330 (1991). The requirement that a warrant be obtained before conducting a search "reflects the sound policy judgment that, absent exceptional circumstances, the decision to invade the privacy of an individual's personal effects should be made by a neutral magistrate . . . . The point of the Fourth Amendment, which often is not grasped by zealous officers, is not that it denies law enforcement the support of the usual inferences which reasonable men draw from evidence. Its protection consists in requiring that those inferences be drawn by a neutral and detached magistrate instead of being judged by the officer engaged in the often competitive enterprise of ferreting out crime." (Citations omitted; internal quotation marks omitted.) *State* v. *Miller*, supra, 219.

"Th[e] protection [afforded by both the federal and state constitution] is particularly important where searches are concerned. Unlike a seizure, which involves state interference with a person's possessory interest, a search constitutes state interference with a person's privacy interest. . . . Although an improper seizure can be undone by returning the seized property, privacy, once invaded, cannot be restored. Thus, the invasion of privacy occasioned by an illegal search cannot be remedied satisfactorily, even if a judge subsequently determines that the search was not supported by probable cause." (Citation omitted.) Id., 220; see also *Horton* v. *California*, 496 U.S. 128, 133, 110 S. Ct. 2301, 110 L. Ed. 2d 112 (1990).

Despite the preference for warrants, both our state courts and the federal courts have recognized "a few specifically established and well-delineated exceptions" to that general rule. *Katz* v. *United States*, supra, 389 U.S. 357; *State* v. *Lewis*, supra, 220 Conn. 609. One of these exceptions was first enumerated in *Terry* v. *Ohio*, 392 U.S. 1, 88 S. Ct. 1868, 20 L. Ed. 2d 889 (1968). In *Terry*, the United States Supreme Court held that the fourth amendment of the United States constitution permitted law enforcement officials to "stop and frisk" suspicious persons without a warrant. Id., 27. The Supreme Court recognized, however, that even a "limited search of [a person's] outer clothing . . . constitute[s] a severe, though brief, intrusion upon cherished personal security," but determined that the intrusion was outweighed by the need of law enforcement officials to protect themselves and others from harm. Id., 24–25. The fourth amendment was, therefore, interpreted to provide law enforcement officials with "narrowly drawn authority to permit a reasonable search for weapons for the protection of the police officer, where he has reason to believe that he is deal-

ing with an armed and dangerous individual, regardless of whether he has probable cause to arrest the individual for a crime." Id., 27.

The United States Supreme Court made clear in *Terry* that such a search could not be justified by "any need to prevent the disappearance or destruction of evidence of crime." Id., 29. "The sole justification of the search [permitted by *Terry*] is the protection of the police officer and others nearby, and it must therefore be confined in scope to an intrusion reasonably designed to discover guns, knives, clubs, or other hidden instruments for the assault of the police officer." Id. The Supreme Court further reinforced the limitations of *Terry* in *Sibron* v. *New York*, 392 U.S. 40, 65–66, 88 S. Ct. 1889, 20 L. Ed. 2d 917 (1968), where it made clear that a protective search that goes beyond that which is necessary to determine whether a person being detained is armed is constitutionally impermissible and the fruits of any seizure made thereunder must be suppressed.

Our Supreme Court adopted the ruling in *Terry* as a matter of state constitutional law in *State* v. *Williams*, 157 Conn. 114, 249 A.2d 245, cert. denied, 395 U.S. 927, 89 S. Ct. 1783, 23 L. Ed. 2d 244 (1968). Our Supreme Court stated: "We are in accord with the proposition [enumerated in *Terry*] that, as a matter of common law, [w]hen an officer is justified in believing that the individual whose suspicious behavior he is investigating at close range is armed and presently dangerous to the officer or to others, it would appear to be clearly unreasonable to deny the officer the power to take necessary measures to determine whether the person is in fact carrying a weapon and to neutralize the threat of physical harm." (Internal quotation marks omitted.) Id., 118. The *Williams* court therefore held that, as a matter of state constitutional law, police officers were permitted to detain persons suspected of

being dangerous or committing a crime and to "frisk" such persons for the purpose of determining whether they are carrying a weapon. Id., 118–19.

Our cases following *Williams* have consistently reemphasized the reasoning of *Terry* v. *Ohio*, supra, 392 U.S. 30, that the search permitted is limited in scope to a protective search for weapons and does not extend to a "general exploratory search for whatever evidence of criminal activity [an officer] might find." See, e.g., *State* v. *Mierez*, 24 Conn. App. 543, 548, 590 A.2d 469, cert. denied, 219 Conn. 910, 911, 593 A.2d 136 (1991); Our cases have also made clear that a *Terry* stop that is justified at its inception can become constitutionally impermissive if it becomes more intrusive than needed to complete the investigation for weapons. *State* v. *Edwards*, 214 Conn. 57, 72, 570 A.2d 193 (1990); *State* v. *Mitchell*, 204 Conn. 187, 197, 527 A.2d 1168, cert. denied, 484 U.S. 927, 108 S. Ct. 293, 98 L. Ed. 2d 252 (1987).

The United States Supreme Court, however, has been gradually moving away from the limitations enumerated by *Terry* v. *Ohio*, supra, 392 U.S. 1, and we are faced in this case with deciding whether our state constitution permits us to follow their lead. We conclude that the constitution of Connecticut, article first, § 7, does not permit the expansions recognized under the federal constitution in *Minnesota* v. *Dickerson*, supra, 508 U.S. 366.

In *Dickerson*, the United States Supreme Court held that the fourth amendment permits the seizure of contraband "detected during a protective patdown search of the sort permitted by *Terry*." Id., 373. In arriving at its decision, the Supreme Court referred, by way of analogy, to the doctrine of "plain view." Id., 374–75. "Under [the doctrine of plain view], if police are lawfully in a position from which they view an object, if its incrimi-

nating character is immediately apparent, and if the officers have a lawful right of access to the object, they may seize it without a warrant." Id., 375. From that doctrine, the Supreme Court believed that their holding of "plain feel" logically flowed. Id., 375–76. The *Dickerson* court stated: "If a police officer lawfully pats down a suspect's outer clothing and feels an object whose contour or mass makes its identity immediately apparent, there has been no invasion of the suspect's privacy beyond that already authorized by the officer's search for weapons; if the object is contraband, its warrantless seizure would be justified by the same practical considerations that inhere in the plain-view context." Id.

Although Connecticut has also adopted the plain view doctrine; *State* v. *Krause*, 163 Conn. 76, 82–83, 301 A.2d 234 (1972); we do not find it an apt analogy to the situation before us. Accordingly, we hold today that the "plain feel" doctrine enunciated in *Minnesota* v. *Dickerson*, supra, 508 U.S. 375–76, expands the permissible search beyond the bounds of the Connecticut constitution and ignores the rationale for the limited exception to the warrant requirement that was created in *Terry* v. *Ohio*, supra, 392 U.S. 1, and *State* v. *Williams*, supra, 157 Conn. 114.

In arriving at this result, we are mindful of the applicable factors enumerated in *State* v. *Geisler*, supra, 222 Conn. 685–86, as important to determining the contours of our state constitution.[5] We have already set forth that the holdings of this court and of our Supreme

[5] *State* v. *Geisler*, supra, 222 Conn. 685–86, set forth six factors to consider when evaluating the rights afforded to Connecticut citizens under our constitution: (1) the text of the constitutional provisions; (2) holdings and dicta of the Supreme and Appellate Courts of this state; (3) federal precedent; (4) sister state decisions; (5) historical considerations; and (6) economic/sociological considerations. Only those factors relevant to the particular case need be addressed. *State* v. *Miller*, supra, 227 Conn. 381–82.

Court have consistently limited *Terry* searches to a protective search for weapons and that the *Terry* exception to the warrant requirement must be narrowly drawn to protect officers and others from harm while not unnecessarily intruding on an individual's right to privacy. See, e.g., *State* v. *Williams*, supra, 157 Conn. 114. We cannot ignore this long history in Connecticut and the rights that Connecticut citizens have thus come to expect as their due.

Our conclusion also finds support in the opinion of the Minnesota Supreme Court in its evaluation of *Minnesota* v. *Dickerson*, 481 N.W.2d 840 (Minn. 1992). The Minnesota Supreme Court, albeit under its interpretation of the fourth amendment to the federal constitution, and not as an interpretation of its own state charter, rejected the analogy of plain feel to the plain view doctrine on two bases: (1) "the sense of touch is inherently less immediate and less reliable than the sense of sight"; and (2) "touch is far more intrusive into the personal privacy that is the core of the fourth amendment." Id., 845. We agree that the sense of touch is far more unreliable and touching far more intrusive into the right of personal privacy expected by our citizens and conclude that the concept of "plain feel" fails to comport with the mandate of article first, § 7, of the Connecticut constitution.

We note that in arriving at this decision, "[w]e are ever mindful of the legitimate needs of law enforcement officials and do not cavalierly restrict the investigative tools at their disposal. Nonetheless . . . [e]ven if the warrant requirement does inconvenience the police to some extent . . . [i]t is merely a part of the price that our society must pay in order to preserve its freedom." (Internal quotation marks omitted.) *State* v. *Miller*, supra, 29 Conn. App. 235, quoting Justice Stevens' dissent in *California* v. *Acevedo*, 500 U.S. 565, 601, 111 S. Ct. 1982, 114 L. Ed. 2d 619 (1991).

Application of our holding today to the facts of the case before us mandates suppression of the cocaine seized from the defendant's pocket. Pagan had reason to believe that he and his fellow officers may have been in danger upon entering Montesi's home. Because of their inability to conduct a surveillance, they could not know how many people they would find in the home. In addition, the search warrant itself stated that weapons were likely to be found on the premises. Pagan and his fellow officers were surely aware that weapons are often used by those involved in the trafficking of narcotics. Furthermore, the warrant application requested nondisclosure of its contents because of a fear that Montesi or one of her associates might retaliate against the confidential informants that provided the police with information. Pagan, therefore, had every reason to detain the defendant in order to secure the premises and to ensure that the defendant was not armed. See *State* v. *Williams*, supra, 157 Conn. 118.

Pagan testified that his patdown search of the defendant revealed that the defendant was not in possession of any type of weapon. Once he was assured that the defendant was not armed and that he was not in danger, that search should have ended. There was no indication that Pagan believed that the hard object that he felt in the defendant's front pocket was any sort of weapon. In fact, his testimony was to the contrary. Pagan's search of the defendant was thus sufficient to secure his safety and the safety of the others in the Montesi home without reaching into the defendant's pocket to remove contraband. The search of the defendant went beyond the permissible bounds of the Connecticut constitution and the evidence seized must therefore be suppressed. See *State* v. *Edwards*, supra, 214 Conn. 72.

The judgment is reversed and the case is remanded with direction to grant the defendant's motion to suppress.

In this opinion the other judges concurred.