[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.] MEMORANDUM OF DECISION Re: Seizure of Weapons pursuant to Public Act 99-212 Sec. 18(a) (An Act Concerning Firearm Safety)
 I. Facts.
On November 1, 1999, certain members of the Connecticut state police major crime squad sought and obtained a search and seizure warrant to enter into the home of David Avery and seize any firearms that might be found on his premises. The seizure was made pursuant to Public Act 99-212 Sec. 18, An Act Concerning Firearm Safety (hereinafter referred to as "the act"). Section (d) of the act requires that the court hold a hearing at the geographical area court within fourteen days after the execution of the warrant. A hearing was held on November 12, 1999, at which hearing the attorney for David Avery appeared. In order to expedite judicial review of the legal sufficiency of the warrant, the defense stipulated that for the purpose of review only, that the facts in the warrant are conceded to have been proven by clear and convincing evidence, the standard of proof required by the act.
The affidavit in support of the warrant contains, inter alia, the following: "That on October 31, 1999 at approximately 1 a.m., Detective David LeBlanc and Detective Richard Bedard of the Connecticut state police interviewed both Heather Washington and Earnest Tucker[1] following their interview with the Rhode Island state police. According to Washington, she is presently residing in Hartford, Connecticut where she is a Kindergarten schoolteacher. On October 30, 1999 some time after 8 p. m., CT Page 15440 Washington and her boyfriend, Tucker, left Providence, Rhode Island where they were visiting with her parents and where they were en route to Hartford. They were traveling in Washington's Jeep Grand Cherokee. Washington was driving and Tucker was in the front passenger seat. They traveled through Rhode Island into Connecticut and were on Route 6 in Brooklyn, Connecticut. As they approached the intersection of Route 169 in Brooklyn, Connecticut, they came upon a blue/gray pickup that was just about stopped in the westbound lane. Washington passed the pickup truck and continued traveling west. As she continued, Washington noticed that the truck that she passed was approaching her flashing its high beams. The truck then got real close to Washington's vehicle and continued flashing its high beams. Washington increased her speed and the driver of the truck did the same. The truck then attempted to get along the left side of Washington's vehicle and the driver started yelling at Washington. According to Washington and Tucker, it was something to the effect of "white power." Washington became very concerned for her safety at this point and increased her speed. The driver of the truck did the same. According to Washington, she reached speeds in excess of 100 miles per hour and the truck continued following her. As Washington passed through the intersection of Route 6 and Route 198 in Chaplin, Connecticut, Tucker told her to turn around and head east in the hope that the truck would just continue west. As Washington turned the vehicle around, both Washington and Tucker saw that the driver of the truck was a white male and that he was pointing a handgun in their direction. Washington now was heading east on Route 6 and the truck also turned around and followed. Washington again increased her speed, at times in excess of 100 miles per hour, and the truck continued to follow. At one point as they were driving east, both Washington and Tucker heard several loud pops and realized that the driver of the truck was shooting at them. Washington stated that she was looking for any business establishment that was open so that she and Tucker could seek refuge and get help. They continued east at high rates of speed through Brooklyn, Connecticut and into Killingly, Connecticut. They then blew through three red lights at the intersection of Route 6 and Route 12 in Killingly and passed under the Providence and Worcester Railroad bridge. As they proceeded up the hill, still traveling east, they heard several more gun shots. At about the same time, the driver of the truck started ramming the rear of Washington's vehicle. It was at this point and shortly after the gun shots, that the left rear tire of Washington's vehicle went flat and shredded. Washington continued driving east with the truck CT Page 15441 following. They entered Foster, Rhode Island and just over the state line found a Texaco station that appeared to be open. Washington pulled into the Texaco station and both Washington and Tucker ran from their vehicle into the station and yelled for the clerk to call the police. Tucker held the front door closed and saw the truck that was following them also pulled into the Texaco station. According to Tucker, the driver of the truck ran up to the front door with a handgun in his hand and tried to get into the store. Tucker then heard a thud and saw a red vehicle leave the area. Tucker then saw the white male with the gun flee the area. Moments later the police arrived."
The affidavit in the warrant also contains the following report:
"That on October 30, 1999 at approximately 10:18 p. m., Trooper Donald Hill interviewed Kenneth Salisbury who was a patron at Helen's Place located next door to the Texaco station in Foster, Rhode Island. According to Salisbury at approximately 9:50 p. m., he was in Helen's Place when a white male came running into the bar yelling "I'm a police officer, I need help, call 911." The white male then slammed a .45 caliber handgun on the bar. The white male then tried to get his ID out of his pocket but dropped it on the bar. Salisbury then picked up the ID and saw a badge. Salisbury then told the rest of the patrons in Helen's Place that the white male was a police officer. The white male then told Salisbury that he was shooting at the tires of a car that he was pursuing and that it started in Brooklyn, Connecticut. The white male was hysterical, sweating and also stated "I shot at the suspects and they're coming in here after me, protect yourself." Salisbury then took the .45 caliber handgun from the white male and then turned it over to the Rhode Island authorities when they arrived a short time later. The white male was identified as David A. Avery, date of birth January 14, 1956 of Canterbury, Connecticut." It is undisputed that David Avery is not a police officer, he is a deputy sheriff. His duties as a deputy sheriff do not include general enforcement of the motor vehicle or criminal laws of the state of Connecticut.
The six pages of the affidavit contain numerous reports of interviews with witnesses to support and expand upon the desperate scenario described by Heather Washington. Subsequently, David Avery was arrested by the Rhode Island authorities and charged with four counts of assault with a deadly weapon, one count of carry a weapon while intoxicated, driving while CT Page 15442 intoxicated and having a weapon without a permit. The state's attorney represented at the mandatory hearing that warrants are presently outstanding for the arrest of David Avery in Connecticut.
Mr. Avery was interviewed at state police headquarters in Situate, Rhode Island by members of the Rhode Island and Connecticut state police. The affidavit reports that: "Avery admitted to shooting his Colt .45 pistol at the Jeep in Connecticut as he chased it into Rhode Island. Avery also stated that he was drinking alcohol earlier in the day while playing golf and then later at a friend's house on Alexander's Lake in Killingly, Connecticut. Avery admits that he may have a problem with alcohol and in the past has stopped drinking for months at a time. Avery has never sought professional help for his alcohol consumption. Avery admitted to having a .38 caliber handgun, a shotgun and .22 caliber rifles as well as ammunition for the weapons at his home at 6 Jimmy Road in Canterbury, Connecticut."
The Connecticut state police have a Firearms and Weapons unit. Noreen Zercie of that unit indicated to the investigators that Mr. Avery has a valid Connecticut pistol permit. She also indicated that Mr. Avery has a total of 23 weapons in his home "on file at the Weapons and Permits Office." Based upon these facts and information, the affiants sought and obtained a warrant to seize the firearms at the Avery residence, "in accordance with Public Act 99-212, An Act Concerning Firearm Safety."[2]
 II. Constitutional Claims
The passage of this 1999 act in the General Assembly was marked by spirited debate. Representative Richard D. Tulisano, known by his colleagues as a zealous guardian of constitutional protections, vigorously opposed passage of this bill. Quoting Justice Louis Brandeis, Representative Tulisano suggested that the bill constituted an "invidious encroachment by men of zeal, well meaning, but without understanding", upon the liberties of men. 42 H.R. Proc., Pt 15, 1999 Sess., p. 5361. Thefourth amendment to the United States constitution invoked by Representative Tulisano provides: "[T]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no warrants shall issue, but upon probable cause, supported by oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized." CT Page 15443
Although the defendant through counsel also raised the specter of constitutional deficiencies in the new act, he has failed to provide an independent analysis of the state or federal constitutional issues. See State v. Geisler, 222 Conn. 672, 685,610 A.2d 1225 (1992) (setting forth appropriate factors to be addressed when raising state constitutional claim). "We have repeatedly apprised litigants that we will not entertain a state constitutional claim unless the defendant has provided an independent analysis under the particular provisions of the state constitution at issue. . . . Without a separately briefed and analyzed state constitutional claim, we deem abandoned the defendant's claim.(internal quotations omitted). State v. Eady,249 Conn. 431, 435 (1999) ___ A.2d ___. Similarly, any person making state or federal constitutional claims must develop the argument either in a brief or in oral argument if the defendant wishes the court to consider them. Barton v. Ducci Electrical Contractors,Inc., 248 Conn. 793, 820, ___ A.2d ___ (1999); Taravella V.Stanley, 52 Conn. App. 431, 432, ___ A.2d ___ (1999). While the court is mindful of the concerns of Representative Tulisano and the constitutional concerns of the defendant, the concerns have not been appropriately raised, nor are they necessary to a resolution of this case.
 III Legislative History
Senator Alvin W. Penn provided a brief overview of the bill[3] to the members of the Senate. He explained that "Section 18 . . . [a]llows the state's attorney or assistant state's attorney or two police officers to file an affidavit with the superior court judge stating that probable cause exists to believe that a person poses a risk of imminent physical injury to him or herself, or others. . . . And [a] warrant may only be issued after an independent investigation has determined that probable cause exists and there are no other alternatives or remedies available to avoid physical injury." 42 S. Proc., Pt. 9, 1999 Sess., p. 3074.
Senator George C. Jepsen, another proponent of the bill explained that "imminent" means "anywhere from hours to a few days in time." 42 S. Proc., supra, p. 3131. However, he also went to explain that the judge would have the responsibility to "flesh out standards such as this." 42 S. Proc., supra, p. 3131. He stated that he thought "that the real . . . or most common thread would be that the individual is, is making threats of violence CT Page 15444 broadly which do not rise to the level of a legal threat, which is actionable as a crime." 42 S. Proc., supra, p. 3133.
In defining "independent investigation," Senator Jepsen stated, "the police would follow up on complaints [from] a neighbor [for example] and make their own independent evaluation, based on evidence that they could amass. And if they find sufficient cause, they think . . . would hit the probable cause standard, just as with a search warrant or an arrest warrant, they would go to court." 42 S. Proc., supra, p. 3135.
In giving an overview of SB 1166, Representative Michael P. Lawlor explained, in relevant part, that the bill is now "very tightly written to ensure that this procedure [seizure], extraordinary as it is, could only be employed in circumstances where there was a clear and imminent danger to public safety and clear and convincing evidence that a person had become dangerous. . . . It would require . . . police officers or prosecutors to do an investigation and independently determine that someone (a) is in possession of weapons; (b) is dangerous to themselves or to others; and (c) that danger is imminent; and (d) that there's no other alternative available besides the one outlined in this bill." 42 H.R. Proc., supra, p. 5342-43.
In explaining what an "independent investigation" should entail, Rep. Lawlor stated that "[t]he requirements of an independent investigation would require the police to go out and talk to other witnesses to find out if, in fact, the allegations [being] made [are] true or can be corroborated in any way. In other words, not to just take the word of one individual for it, but to go out and attempt to corroborate it." 42 H.R. Proc., supra, p. 5389-90.
Representative Lawlor also explained that all other alternatives must be ruled out before resorting to the seizure of a person's firearms: "Under certain circumstances civil commitment might be an option. They would be required to rule that out before proceeding with this option. Under certain circumstances arrest might be an option. They would be required to rule that out before pursuing this option. Under certain circumstances a voluntary or a consensual search might be an option. For example, perhaps family members would be willing to permit such a search. That's perfectly allowable under the current law. They would have to rule out that option. This would only be the last resort. . . ." 42 H.R. Proc., supra, p. 5343. CT Page 15445 "[The police] are obligated to exhaust every other possibility and ultimately the judge has to be convinced that there's imminent danger to someone's well being. In other word, someone is about to get hurt and there's no other alternative." 42 H.R. Proc., supra, p. 5394. Later in the hearing, Rep. Lawlor also reiterated that "if there is an arrest you wouldn't need to resort to this." 42 H.R. Proc., supra, p. 5405.
Representative Ronald S. San Angelo a strong proponent of this bill and key figure in the drafting of the bill, explained that "police officers . . . will have to do a full investigation before they could ever go to a judge . . . [and] they will have to look at every other possible alternative before they can ever even go to a judge. And the standard is set extremely high. Imminent danger to himself or to others which means that he has to be getting ready to either kill himself or to kill somebody else. . . . I believe that any reasonable judge in the State of Connecticut will be extremely cautious in putting this provision forward, will look very closely for absolute purposes of legislative intent, it makes it absolutely clear that this is not intended to be used very often, but only in rare extreme situations." 42 H.R. Proc., supra, p. 5354-55.
 IV. Available Alternatives.
Given the legislative history the court will analyze the warrant for compliance with the intention of the legislature and the letter of the law. The warrant on its face clearly establishes that an independent investigation was conducted by the Connecticut state police. The investigation supported the proposition that there was probable cause to believe that the !defendant had acted in a way which could be considered "recent threats or acts of violence by such person directed toward other persons." Indeed, section (b)(A) of the act specifically includes factors for a judge to consider in assessing the risk of imminent personal injury; (A) "the reckless use, display, or brandishing of a firearm, by such person." The judge was presented with sufficient information to establish a ground for issuing the warrant.
However, there is no fact or representation contained in the warrant under oath that establishes that the state's attorney or the police officers addressed the issue of available alternatives to prevent the person from causing imminent personal injury to himself or to others with the firearms. This aspect of the CT Page 15446 legislation was critical to its passage. The police were duty bound to explore alternate measures.
Representative Kosta M. Diamantis questioned Rep. Lawlor regarding what happens after the police have conducted their independent investigation and believe they have probable cause: "is it a condition of the warrant that the police must demonstrate that, in fact, there are no reasonable alternatives available to prevent such person from causing imminent risk of injury? Does that requirement need to be part of the warrant?" 42 H.R. Proc., supra, p. 5398. Rep. Lawlor responded, "[y]es, it does." 42 H.R. Proc., supra, p. 5398. Rep. Lawlor also affirmed that if the police fail to establish that a lesser alternativedoes not exist, it negates the ability of the judge to sign thatwarrant. 42 H.R. Proc., supra, p. 5398-99. (Emphasis added).
The most obvious alternative to seeking a warrant to search a home and seize property, and one very frequently used by the police in other cases, is the consensual search. Here the police had the opportunity to interview Mr. Avery under controlled circumstances at a time when he did not have immediate access to the weapons. Indeed, he was personally interviewed by the Connecticut state police in the Situate, Rhode Island state police barracks. Even now, Mr. Avery is presently being held at the Adult Correctional Institution in Rhode Island. At no time does it appear that the defendant was asked whether he would voluntarily surrender the weapons to the police or to others who are permitted to receive and hold the weapons pursuant to subsection (e) of the act.[4] Neither were any of Mr. Avery's legal representatives, such as his wife, asked for permission to remove the firearms or to transfer them to a secure place.
The court is aware that this alternative, available and reasonable in this case, may not always be available through non-cooperation of the accused, the delicacy or urgency of the situation, or for other good and just reasons. But the statute is clear that the application for a warrant must contain a factual representation sufficient for the court to support a finding that "no reasonable alternative" is available before a warrant may be considered by a judge. No such representation of facts was offered in this case. The warrant lacks legal sufficiency.
 V. Order.
The weapons seized pursuant to the warrant are ordered CT Page 15447 returned to the legal representative of David Avery. Nothing contained herein shall prevent the state's attorney or police officers from resubmitting a warrant which fully complies with the act.
Foley, J.