******************************************************

The "officially released" date that appears near the beginning of each opinion is the date the opinion will be published in the Connecticut Law Journal or the date it was released as a slip opinion. The operative date for the beginning of all time periods for filing postopinion motions and petitions for certification is the "officially released" date appearing in the opinion. In no event will any such motions be accepted before the "officially released" date.

All opinions are subject to modification and technical correction prior to official publication in the Connecticut Reports and Connecticut Appellate Reports. In the event of discrepancies between the electronic version of an opinion and the print version appearing in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports, the latest print version is to be considered authoritative.

The syllabus and procedural history accompanying the opinion as it appears on the Commission on Official Legal Publications Electronic Bulletin Board Service and in the Connecticut Law Journal and bound volumes of official reports are copyrighted by the Secretary of the State, State of Connecticut, and may not be reproduced and distributed without the express written permission of the Commission on Official Legal Publications, Judicial Branch, State of Connecticut.

******************************************************

STATE OF CONNECTICUT *v.* DWIGHT DICKERSON
(AC 35725)

Beach, Sheldon and Norcott, Js.

*Argued May 21—officially released July 22, 2014*

(Appeal from Superior Court, judicial district of New Haven, geographical area number twenty-three, Lager, J. [judgment]; Holden, J. [motion for exemption].)

*S. Max Simmons*, with whom was *Diane Polan*, for the appellant (defendant).

*James M. Ralls*, assistant state's attorney, with whom, on the brief, were *Michael Dearington*, state's attorney, and *Mary A. SanAngelo*, senior assistant state's attorney, for the appellee (state).

*Opinion*

SHELDON, J. The defendant, Dwight Dickerson, appeals from the judgment of the trial court denying his motion for exemption from lifetime registration on the Connecticut sex offender registry on the ground that the statutory scheme imposing the lifetime registration requirement upon him violates his rights under the equal protection clauses of the United States and Connecticut constitutions. The defendant claims initially that the challenged statutes violate the fourteenth amendment to the United States constitution by differentiating, without a rational basis, between himself and others like him who have been convicted of sexual assault in the second degree in violation of General Statutes § 53a-71 (a) (2),[1] which is statutorily categorized as a "sexually violent offense" for which lifetime sex offender registration is required, and persons who have been convicted of other forms of sexual assault in the second degree which have not been so characterized, and thus for which sex offender registration is limited to a period of ten years. As his fallback position, the defendant argues that even if the statutorily mandated difference in registration requirements survives his federal equal protection challenge because it is found to be supported by a rational basis, it must nonetheless be struck down under what he claims to be the heightened standard of review applicable to equal protection challenges under article first, § 20, of the Connecticut constitution, as amended by articles five and twenty-one of the amendments.

The state disagrees, arguing first that there is indeed a rational basis for requiring lifetime sex offender registration for persons convicted of violent second degree sexual assaults, while imposing a shorter registration period upon persons convicted of other forms of second degree sexual assault. Therefore, it argues, because the defendant cannot establish that his state equal protection challenge to the sex offender registration statutes is subject to review under a higher standard of scrutiny than his federal equal protection challenge to those statutes, both challenges must be rejected because the differential treatment authorized by those statutes is supported by a factual basis. We agree with the state, and thus affirm the judgment of the trial court.

The following procedural history, as set forth by the court, is relevant to our resolution of this claim: "The [defendant] pleaded guilty to one count of sexual assault in the second degree under the *Alford* doctrine[2] and two counts of fourth degree sexual assault. The trial court imposed sentence on December 14, 1994. The court sentenced the [defendant] to eight years incarceration suspended after serving four years, to be followed by five years of probation. The court sentenced the [defendant] to a one year period of incarceration on each count of fourth degree sexual assault for

a total effective sentence of eight years suspended after four years incarceration and five years probation. . . .

"While incarcerated [the defendant] was a model inmate. He had no disciplinary actions taken against him. While in prison he took advantage of virtually every opportunity available to him, including sex offender classes, a course in life planning skills, basic and advanced courses in nonviolent conflict resolution, a course in anger and aggression, two religious courses given by the Prison Fellowship, and the Emmaus Bible Correspondence Course. He took two classes offered by Asnuntuck [Community] College (with a 3.5 GPA). He worked as an assistant teacher in the GED course in Cheshire Correctional Institution and as a math instructor in Osborn Correctional Institution, and his supervisors have recommended him very highly.

"In 1996, after serving two years of his original four year sentence, [the defendant] was paroled directly to his family, pursuant to the trial court's order, after having been approved by his treatment provider to live with his young children.

[The defendant] successfully completed five years of probation. Since [his] release in 1996 . . . he has not been arrested or otherwise involved with the criminal justice system. He also continued to seek treatment for his behavioral issues. He successfully completed five years of sex offender treatment with the Center for the Treatment of Problem Sexual Behavior in Middletown. While in the program he took and passed three polygraph tests and also had his home computer searched multiple times for inappropriate material, and none was ever found.

"From 2002 to 2007, [the defendant] paid for and received private counseling. His clinical therapist attested that [the defendant] 'has accomplished successful control of his prior adjustment issues.' He has also sought out educational opportunities at his church; in 1999, he completed a course in parenting adolescents at the Church on the Rock.

"[The defendant] has also had a successful working career since his release from incarceration. From 1997 to 2003 he worked as a machinist for Moroso, GKN Westland Aerospace, and AMTEC, learning to work on computerized numerical control machines. In 2003 he joined Sikorsky Aircraft as a multimachine specialist; in 2009 he became final assembly mechanical inspector, inspecting helicopters before they are delivered to military or civilian customers. He has had no disciplinary issues at work, has been continuously employed at Sikorsky since 2003, and has been highly recommended by his supervisor.

"[The defendant] has made extraordinary efforts to obtain higher education since [his] release. In January, 2004, he began taking classes at Albertus Magnus Col-

lege in New Haven, where he had a 3.7 GPA. In 2005, he became a nondegree student at Yale University; after one year, he was admitted to the degree program. He attended Yale while working full-time at Sikorsky and while supporting his two children through college. [The defendant] graduated from Yale in 2010 with a B.A. in sociology and a focus on urban studies; his GPA was 3.23. In the fall of 2011, he began a master's program in sociology at Southern Connecticut State University while continuing to work full-time.

"[The defendant] actively participates in and contributes to his community. Since his release, he has been an active member of first the Kingdom Life Christian Church in Milford and then the Church on the Rock in New Haven. He has been highly recommended by the pastors of both churches. He plays keyboards and trumpet in his church's band and is an active musician in the community, giving volunteer performances at Emergency Shelter Management Services in New Haven and at the Seacrest Retirement Center in West Haven. In 2008, he helped establish a summer scholarship program at the Neighborhood Music School in New Haven.

"Further, the facts reveal that [the defendant] is also the founder and CEO of Tri-Cord, an organization dedicated to providing tools to formerly incarcerated people to help them become successful. He does motivational speaking based on his own challenges and successes. [The defendant] is an active member of the New Haven Reentry Roundtable and a respected spokesperson for formerly incarcerated people. On May 7, 2012, the Connecticut Department of Correction granted [the defendant] direct access to DOC facilities as a 'VIP Professional Partner.' On May 11, 2012, the Judicial Branch notified him that Tri-Cord had been selected to provide training services related to family matters and the criminal system.

"Prominent members of the community offered letters of support for the [defendant]. Bishop Jay Ramirez, senior pastor of Kingdom Life Christian Church in Milford, Connecticut, stated in a letter of support, 'In this line of work I hear so much garbage and so many promises to change. Too often it simply never comes to pass. From time [to time] I have the privilege of participating in someone's genuine conversion or restoration. [The defendant] is one of these people.' . . .

"The lifetime sex offender registration requirement has imposed numerous significant hardships on [the defendant]. He has been unable to find employment commensurate with his skills and education. He has been denied interviews for supervisory and management positions at Sikorsky, and for the company's leadership training program despite having a completely clean personnel file, several years of experience, and an outstanding education. He has been unable to find temporary jobs as a machinist despite his experience

and skills. He has also suffered harassment from coworkers. In 2008, [the defendant] applied for a pardon but was denied by the Board of Pardons and Paroles, despite his successful rehabilitation and many contributions to the community. The board cited his status as a registered sex offender as the reason for denying his application." (Citation omitted; footnote omitted.) On February 3, 2012, the defendant filed a motion for exemption from lifetime registration on the Connecticut sex offender registry. The court heard argument on the defendant's motion on September 11, 2012, and subsequently denied the defendant's motion, issuing an accompanying memorandum of decision dated May 10, 2013, from which this appeal followed.

We begin our analysis of the defendant's claim, as did the trial court, with a review of the relevant statutory authority governing motions for exemption from the sex offender registry, as set forth in General Statutes § 54-251 (b) and (c), and of the history of the sex offender registration requirements, as codified in General Statutes § 54-250 through 54-261, also known as Megan's Law. "The legislature enacted [Megan's Law] to protect the public from sex offenders . . . . The requirement to register as [a] sex offender is regulatory, rather than punitive, in nature . . . .

"[As our] Supreme Court has observed, the goal of Megan's Law . . . is to alert the public by identifying potential sexual offender recidivists when necessary for public safety. . . . This goal is accomplished by requiring persons convicted of certain offenses to register with the [Commissioner of Emergency Services and Public Protection] and by mandating disclosure of that registry to the public.

"The law designates four classes of offenses: (1) the victim is a minor or the sexual offense is nonviolent; General Statutes § 54-251; (2) the sexual offense is violent; General Statutes § 54-252; (3) the sexual offense was committed in another jurisdiction; General Statutes § 54-253; or (4) the felony was committed for a sexual purpose. General Statutes § 54-254. Our Supreme Court [has held] . . . that [o]nly under the last classification is the trial court given discretion whether to impose the registration requirement . . . we did not explain the basis for that conclusion. The text of the statutory scheme, however, makes that distinction clear. The first three provisions provide that a defendant shall register . . . .

"[Before the trial court, the defendant did] not challenge the factual underpinnings that form the basis for mandatory registration under § 54-250 et seq.; neither [was] there any dispute that the applicable language of this statute is cast in mandatory terms. The obligation to register as a sex offender is triggered by the entry of the judgment of conviction(s) of predicate sexual offenses. . . . The [defendant did] not claim exemp-

tion pursuant to any exception under § 54-250. Absent that, our registration scheme does not authorize or provide for individualized assessment nor offer the registrant the opportunity to demonstrate rehabilitation or shorten [his or her] registration requirement." (Citations omitted; internal quotation marks omitted.)

## I

### FEDERAL EQUAL PROTECTION CHALLENGE

The defendant was convicted of second degree sexual assault under § 53a-71 (a) (2) for engaging in sexual intercourse with a victim who was "mentally defective to the extent that [she] was unable to consent to such sexual intercourse." The challenged statutes, particularly § 54-250 (11),[3] categorize that offense as a "sexually violent offense," and thereby require, pursuant to § 54-252 (a),[4] that persons convicted of that offense register as sex offenders for life. The defendant first claims that the court erred in finding that the lifetime registration requirement does not violate his right to equal protection of the laws under the fourteenth amendment to the United States constitution. Specifically, he argues that the court was unable to articulate any rational basis for establishing different sex offender registration requirements for those who commit different forms of second degree sexual assaults. The state claims, to the contrary, that there is indeed a rational basis for imposing different sex offender registration requirements upon those who commit different types of second degree sexual assault, and thus that the lifetime registration requirement imposed upon the defendant for his conviction of a violent sexual assault does not violate his right to equal protection of the law under the federal constitution. We agree with the state.

The question of whether the application of the statutory scheme imposing sex offender registration upon the defendant violates his equal protection rights is a question of law over which we have plenary review. See *State* v. *Long*, 268 Conn. 508, 530, 847 A.2d 862 (en banc), cert. denied, 543 U.S. 969, 125 S. Ct. 424, 160 L. Ed. 2d 340 (2004). The equal protection clause of the fourteenth amendment to the United States constitution provides that no state shall "deny to any person within its jurisdiction the equal protection of the laws." U.S. Const., amend. XIV, § 1. "[T]he concept of equal protection . . . has been traditionally viewed as requiring the uniform treatment of persons standing in the same relation to the governmental action questioned or challenged. . . . Conversely, the equal protection clause places no restrictions on the state's authority to treat dissimilar persons in a dissimilar manner. . . . Thus, [t]o implicate the equal protection [clause] . . . it is necessary that the state statute . . . in question, either on its face or in practice, treat persons standing in the same relation to it differently. . . . [Accordingly], the analytical predicate [of an equal protection claim] is a

determination of who are the persons [purporting to be] similarly situated. . . . The similarly situated inquiry focuses on whether the [defendant is] similarly situated to another group for purposes of the challenged government action. . . . Thus, [t]his initial inquiry is not whether persons are similarly situated for all purposes, but whether they are similarly situated for purposes of the law challenged." (Citations omitted; internal quotation marks omitted.) *Kerrigan* v. *Commissioner of Public Health*, 289 Conn. 135, 157–58, 957 A.2d 407 (2008).

"To determine whether a particular classification violates the guarantees of equal protection, the court must consider the character of the classification; the individual interests affected by the classification; and the governmental interests asserted in support of the classification. . . . Where, as here, the classification at issue neither impinges upon a fundamental right nor affects a suspect group it will withstand constitutional attack if the distinction is founded on a rational basis. . . . Rational basis review is satisfied so long as there is a plausible policy reason for the classification . . . . [I]t is irrelevant whether the conceivable basis for the challenged distinction actually motivated the legislature." (Citations omitted; internal quotation marks omitted.) *State* v. *Morales*, 240 Conn. 727, 739, 694 A.2d 758 (1997). "Rational basis review demands only that the challenged classification be rationally related to a legitimate government interest. . . . A party challenging a law under rational basis review bears the burden of proving that the law's class-based distinctions are wholly irrational." (Citation omitted.) *State* v. *Dyous*, 307 Conn. 299, 317, 53 A.3d 153 (2012).

The defendant here claims that the statutory scheme at issue treats differently individuals who have been convicted of second degree sexual assault for committing violent offenses and those who similarly have been convicted of second degree sexual assault, but whose offenses are categorized as offenses against minors or nonviolent offenses. Specifically, he claims that because the statutory scheme requires lifetime registration for violent offenders, but only a ten year registration requirement for offenses against minors and nonviolent offenders, it violates his right to equal protection of the law under the United States constitution. The state argues, to the contrary, that the defendant's claim is flawed because there are no sexual assaults— and thus no registration requirements—that are designated as having been committed solely against adult victims. Rather, it claims that the statutory scheme at issue in this case applies to offenses committed against both adult and minor victims.[5] We agree.

It is undisputed that the statutory scheme imposing sex offender registration requirements neither affects a suspect group nor implicates a fundamental right for

the purposes of the federal equal protection clause, and therefore must be analyzed under rational basis review. Furthermore, we conclude that the defendant is similarly situated, for the purpose of the statutory scheme at issue in his equal protection challenge, to those who have been convicted of nonviolent second degree sexual assaults. Thus, we turn to whether there is a plausible policy reason for this classification.

In the present case, we have no difficulty in ascertaining a rational basis for the disparate treatment in the statutory lifetime sex offender registration requirement for those who have been convicted of violent second degree sexual assaults as compared to the ten year registration requirement for those who have been convicted of nonviolent second degree sexual assaults. We agree with the court's assessment and finding that a rational basis exists for the differentiation in registration requirements between violent and nonviolent second degree sexual assault offenders.

The court explained, "[i]t is well established that [t]he legislature enacted [Megan's Law] to protect the public from sex offenders. . . . [T]he lifetime registration requirement for those convicted of sexually violent offenses reflects an effort to target those sex offenders who engage in particularly predatory conduct. While the defendant contends that the application of the registration requirements could lead to inequitable results in certain situations, it is not the role of the judiciary to second-guess the legislature. Although there may be other, perhaps even better, options available to the legislature to accomplish its legitimate objectives, rational basis review affords great deference to legislative choices and does not authorize this court to substitute its judgment, or that of the [defendant], for that of this state's elected representatives, as long as the classifications drawn by the legislature are reasonable. . . . [E]qual protection is not a license for courts to judge the wisdom, fairness, or logic of legislative choices. . . . Rational basis review is satisfied [as] long as there is a plausible policy reason for the classification . . . . [I]t is irrelevant whether the conceivable basis for the challenged distinction actually motivated the legislature. . . . To succeed, the party challenging the legislation must negative every conceivable basis which might support it." (Citations omitted; internal quotation marks omitted.)

We conclude that the defendant has failed to demonstrate that there is no rational basis for the difference between the registration requirements for those convicted of violent second degree sexual assaults and those convicted of nonviolent second degree sexual assaults.[6] Requiring lifetime sex offender registration for those who have been convicted of violent second degree sexual assaults is rationally related to the government's legitimate interest in protecting the public

from sex offenders whose actions demonstrate a willingness to use force or the threat of force to overcome the will of victims who have not expressed consent to engage in sexual intercourse—and in this case, a victim who was not even capable of expressing such consent by reason of mental defect. Accordingly, the defendant's federal equal protection challenge must be rejected.

## II

### STATE EQUAL PROTECTION CHALLENGE

The defendant's fallback argument is that even if his federal equal protection challenge does not survive rational basis review, the equal protection clause of the Connecticut constitution provides an independent and greater basis to support his claim because it requires heightened review. The state argues that although the defendant raises a claim under the state constitution, he does not demonstrate that the state equal protection clause provides any additional protection or that his claim is subject to heightened review thereunder. We agree with the state that the defendant's equal protection challenge under the Connecticut constitution also must be rejected because he has not established that his claim is subject to heightened review, or is different in any other material respect from his federal equal protection challenge.

The equal protection clause of the Connecticut constitution, article first, § 20, as amended by articles five and twenty-one of the amendments, provides in relevant part that "[n]o person shall be denied the equal protection of the law . . . ."[7] "It is well established that federal constitutional and statutory law establishes a minimum national standard for the exercise of individual rights and does not inhibit state governments from affording higher levels of protection for such rights. . . . [Hence], although we often rely on the United States Supreme Court's interpretation of the amendments to the constitution of the United States to delineate the boundaries of the protections provided by the constitution of Connecticut, we have also recognized that, in some instances, our state constitution provides protections beyond those provided by the federal constitution, as that document has been interpreted by the United States Supreme Court. . . . The analytical framework by which we determine whether, in any given instance, our state constitution affords broader protection to our citizens than the federal constitutional minimum is well settled." (Internal quotation marks omitted.) *State* v. *Wade*, 297 Conn. 262, 286–87, 998 A.2d 1114 (2010).

"[I]n *State* v. *Geisler*, 222 Conn. 672, 685, 610 A.2d 1225 (1992), we set forth six factors that, to the extent applicable, are to be considered in construing the contours of our state constitution so that we may reach reasoned and principled results as to its meaning. These

factors are: (1) the text of the operative constitutional provision; (2) holdings and dicta of this court and the Appellate Court; (3) persuasive and relevant federal precedent; (4) persuasive sister state decisions; (5) the history of the operative constitutional provision, including the historical constitutional setting and the debates of the framers; and (6) contemporary economic and sociological considerations, including relevant public policies." *Kerrigan* v. *Commissioner of Public Health*, supra, 289 Conn. 157. The defendant claims that the fourth, fifth and sixth *Geisler* factors weigh in favor of a more expansive reading of the state equal protection guarantee, and thus support his argument that the court erred in finding that his right to equal protection of the law under the Connecticut constitution was not violated by imposing the lifetime sex offender registration requirement upon him. We will consider each *Geisler* factor in turn to determine whether the equal protection clause of the Connecticut constitution affords greater protection to claimants than its federal counterpart.

With regard to the first *Geisler* factor—the text of the operative state and federal constitutional provisions—the court noted that "the defendant acknowledge[d] that the text of the equal protection clause of the Connecticut constitution is very similar to [that of] the federal equal protection clause and is therefore not particularly instructive in the present case." Indeed, on appeal, the defendant stated in his brief that "[t]he text of article first, § 20, is substantively identical to that of the Fourteenth Amendment, so the first *Geisler* factor does not come into play." Although the defendant argues that the first factor is thus inapplicable to this court's analysis, we conclude that it is not only relevant to that analysis, but supportive of the court's conclusion that the equal protection guarantee set forth in the Connecticut constitution is the same as that set forth in the United States constitution.

The defendant claims as well that the second and third *Geisler* factors—the holdings and dicta of our Supreme Court and this court, as well as persuasive and relevant federal precedent—"do not apply because no Connecticut or federal court appears to have addressed th[is] specific question . . . ." Here, once again, although the defendant argues that the second and third factors are inapplicable to the court's analysis, we find that the lack of Connecticut and federal precedent on this issue actually demonstrates that Connecticut's equal protection provision affords no greater protection to persons bringing state equal protection claims of the sort here presented than federal equal protection claims. The trial court concluded, and we agree, that "the defendant has not shown that the *Geisler* factors concerning relevant Connecticut and federal precedent support his argument."

The defendant next claims that the fourth *Geisler*

factor—persuasive sister state decisions—supports his state equal protection challenge because relevant sister state decisions "reject unequal treatment for people convicted of offenses that are almost identical in nature and severity [to that of the defendant]." In this regard, the defendant cites to several California cases for the proposition that other jurisdictions have invalidated aspects of sex offender registration laws that create arbitrary distinctions between different classes of offenders. In particular, the defendant claims that in *People* v. *Hofsheier*, 37 Cal. 4th 1185, 1207, 129 P.3d 29, 39 Cal. Rptr. 3d 821 (2006), the California Supreme Court held that unequal treatment of defendants who have been convicted of oral copulation with a minor—an offense that required mandatory registration—and defendants who have been convicted of sexual intercourse with a minor—an offense that afforded the court discretion whether or not to require registration—violated equal protection because there was no plausible rationale for distinguishing between these two offenses and their respective registration requirements. He attempts to draw a parallel between *Hofsheier* and the facts of this case to lend support to his argument that the distinctions between the registration requirements for different forms of Connecticut's second degree sexual assaults lack any rational basis. We are not persuaded.

In *Hofsheier*, the twenty-two year old defendant, who had pleaded guilty to felony oral copulation with a sixteen year old minor, an offense which required mandatory sex offender registration, claimed a federal equal protection violation because the similar offense of unlawful sexual intercourse with a minor was not subject to mandatory registration, but only to registration only at the court's discretion. Id., 1192. The court found that individuals who were convicted of oral copulation and those who were convicted of sexual intercourse with minors were similarly situated, and thus concluded that there was no rational basis for treating the two groups differently. Id., 1200–1207. The "contrasting treatment of persons convicted of oral copulation with minors and those convicted of unlawful sexual intercourse with minors raise[d] the equal protection issue" in that case; id., 1198; because "[t]he only difference between the two offenses [was] the nature of the sexual act." Id., 1200. Although the California sex offender registration statute at issue in *Hofsheier* distinguished between oral copulation and sexual intercourse with minors for registration purposes, the challenged Connecticut statutes in this case makes no such similar distinction between oral copulation and sexual intercourse for purposes of incarceration, fine or registration, nor do they impose different requirements for one form of second degree sexual assault over the other.

Moreover, the California Court of Appeal expressly declined to extend the holding of *Hofsheier* in *People*

v. *Jeha*, 187 Cal. App. 4th 1063, 114 Cal. Rptr. 3d 711 (2010), a case factually similar to the present case. In *Jeha*, the defendant, who was convicted of sexual penetration of an unconscious victim, an offense which required mandatory sex offender registration, claimed an equal protection violation because the allegedly similar offenses of sexual or oral penetration of a minor required registration only at the court's discretion. Id., 1068. Although the defendant in *Jeha* urged the court "to find him similarly situated with other defendants whose sex offenses involved consensual participants but whose status as minors rendered them unable to give legal consent"; id., 1076; the court rejected this argument, reasoning that "[a] sex offense against an intoxicated or unconscious person is not one that involves a voluntary participant. . . . The forcible nature of [the] defendant's sex offense sets him apart from the [defendant] in *Hofsheier* and following cases in which an equal protection challenge . . . was sustained." (Citation omitted.) Id., 1076–77. The California Court of Appeal thus held that there was no equal protection violation in *Jeha* because the victim in that case had been unconscious at the time of the sexual assault and therefore was unable to consent to penetration. Id. The court in the present case aptly noted that "the distinction drawn by the Connecticut legislature in requiring those convicted of sexually violent offenses to register for life is not arbitrary," as was the distinction ruled unconstitutional in *Hofsheier*. It thus concluded that "the defendant's argument pursuant to *Hofsheier* and its progeny is not persuasive." We agree, and conclude that the fourth *Geisler* factor does not support the defendant's state equal protection challenge.

With regard to the fifth *Geisler* factor—the history of the operative constitutional provision—the defendant claims that our Supreme Court, in *Kerrigan* v. *Commissioner of Public Health*, supra, 289 Conn. 141, held that the equal protection clause of the Connecticut constitution provides broader protection to claimants thereunder than to claimants under the federal equal protection clause, lending support to his state equal protection challenge. Although the court in *Kerrigan* found that Connecticut's equal protection provision guarantees greater protection than its federal counterpart with regard to same sex marriage, that conclusion was reached as a result of the court's determination that sexual orientation is a quasi-suspect class and that laws that treat people differently on that basis are subject to intermediate or heightened scrutiny, rather than rational basis review, to which the defendant's challenge is subject under the federal equal protection clause. Nowhere in his brief does the defendant suggest that Connecticut's equal protection analysis under rational basis review differs in any way from the federal analysis, or that historical factors support a heightened review of his present claim. Thus, we conclude that

the fifth *Geisler* factor does not lend support to the defendant's claim for a heightened standard of review on his state equal protection challenge.

As to the sixth and final *Geisler* factor—contemporary economic and sociological considerations, including relevant public policy—the defendant claims that because there is an increasing awareness that registration can be unduly harsh to those offenders who pose little risk of reoffending, this factor weighs in his favor. Specifically, he claims that exempting him from lifetime registration would enable him to "become a contributing member of society . . . be free of the legal restrictions and ongoing harassment that he currently suffers as a result of registration . . . [and] help him gain employment more commensurate with his education and qualifications . . . ." The court held, and we agree, that "[t]he defendant fails to take into account the legitimate public safety reasons for requiring registration among those convicted of sexually violent offenses," and thus we conclude that the sixth *Geisler* factor does not lend support to the defendant's state equal protection challenge.

In sum, we conclude that the court properly found that none of the *Geisler* factors supports the defendant's claim that heightened scrutiny must be applied to his state equal protection challenge to the requirement that he submit to lifetime registration as a sex offender as a result of his conviction of second degree sexual assault in violation of § 53a-71 (a) (2). For that reason, because the defendant's state equal protection challenge, like his federal equal protection challenge, is subject to rational basis review, that challenge must also be rejected for the reasons set forth in part I of this opinion.

The judgment is affirmed.

In this opinion the other judges concurred.

[1] General Statutes § 53a-71 (a) provides in relevant part: "A person is guilty of sexual assault in the second degree when such person engages in sexual intercourse with another person and . . . (2) such other person is mentally defective to the extent that such other person is unable to consent to such sexual intercourse . . . ."

We note that although § 53a-71 (a) (2) was amended in 2000; see Public Acts 2000, No. 00-161, § 2; since the time of the defendant's crime in 1992, that amendment has no bearing on the merits of this appeal. In the interest of simplicity, we refer to the current revision of the statute.

[2] See *North Carolina* v. *Alford*, 400 U.S. 25, 37, 91 S. Ct. 160, 27 L. Ed. 2d 162 (1970).

[3] General Statutes § 54-250 (11) provides: " 'Sexually violent offense' means (A) a violation of section 53a-70, except subdivision (2) of subsection (a) of said section, 53a-70a, 53a-70b, 53a-71, except subdivision (1), (4), (8) or (10) or subparagraph (B) of subdivision (9) of subsection (a) of said section or subparagraph (A) of subdivision (9) of subsection (a) of said section if the court makes a finding that, at the time of the offense, the victim was under eighteen years of age, 53a-72a, except subdivision (2) of subsection (a) of said section, or 53a-72b, or of section 53a-92 or 53a-92a, provided the court makes a finding that the offense was committed with intent to sexually violate or abuse the victim, (B) a violation of any of the offenses specified in subparagraph (A) of this subdivision for which a person is criminally liable under section 53a-8, 53a-48 or 53a-49, or (C) a violation of any predecessor statute to any of the offenses specified in subparagraph

(A) or (B) of this subdivision the essential elements of which are substantially the same as said offense.”

[4] General Statutes § 54-252 (a) provides in relevant part: “Any person who has been convicted or found not guilty by reason of mental disease or defect of a sexually violent offense, and (1) is released into the community on or after October 1, 1988, and prior to October 1, 1998, and resides in this state, shall, on October 1, 1998, or within three days of residing in this state, whichever is later . . . register such person’s name, identifying factors and criminal history record, documentation of any treatment received by such person for mental abnormality or personality disorder, and such person’s residence address and electronic mail address, instant message address or other similar Internet communication identifier, if any, with the Commissioner of Emergency Services and Public Protection on such forms and in such locations as said commissioner shall direct, and shall maintain such registration for life. . . .”

The defendant was sentenced, on his conviction of second degree sexual assault, to a total effective term of eight years imprisonment, suspended after four years, followed by five years probation. In 1996, after serving two years of his original four year sentence, the defendant was paroled directly to his family. In addition to his second degree sexual assault conviction, the defendant pleaded guilty to two counts of fourth degree sexual assault under General Statutes § 53a-73a arising from two separate incidents in 1993 and 1994. An offense resulting in a conviction of fourth degree sexual assault is categorized as a nonviolent sexual offense and requires only a ten year registration period. See General Statutes §§ 53a-73a, 54-250 (5) and 54-251 (a). Such registration, however, is required only for defendants who were released from custody after October 1, 1998. General Statutes § 54-251 (a). Because the defendant was released prior to October 1, 1998, his conviction of two counts of fourth degree sexual assault do not require registration. Thus, his only conviction requiring registration, and thus the only one before this court on appeal, is that of second degree sexual assault.

[5] The defendant attempts to argue that the statutory scheme at issue in this case imposes a harsher registration period for offenses against adults than those against minors, and that no rational basis could possibly exist for treating people who offend against minors less harshly than those who commit the same crimes against adults. The defendant’s argument, as the state notes, is flawed for several reasons.

All convictions for engaging in intercourse that is compelled by threat or force, against an adult or a minor, require lifetime registration. General Statutes §§ 53a-70 (a) (1) and 54-250 (11). Convictions for engaging in intercourse with minors under age thirteen when the actor is more than two years older also require lifetime registration. General Statutes §§ 53a-70 (a) (2) and 54-250 (11). Further, convictions for engaging in intercourse with any victim, whether an adult or a minor, who is incapable of consenting because of mental disease or defect, or because of a physical incapacity, also require lifetime registration. See General Statutes §§ 53a-70 (a) (4) (mentally incapacitated), 53a-71 (a) (2) (mentally defective), 53a-71 (a) (3) (physically helpless) and 54-250 (11). Additionally, convictions for engaging in intercourse with other vulnerable persons, regardless of their age, when the actor is in a position of authority or control, require lifetime registration. See General Statutes §§ 53a-71 (a) (5) (persons in custody), 53a-71 (a) (6) (psychiatric patients), 53a-71 (a) (7) (medical patients), 53a-71 (a) (11) (persons receiving developmental services) and 54-250 (11).

Sexual assaults committed upon older minors, such as engaging in intercourse with minors between thirteen years of age or older but under sixteen years of age, who may actually consent but who cannot legally consent, or intercourse with minors under the age of eighteen when the actor is a guardian, teacher, coach, or in another position of authority, all are subject to a ten year registration period. See General Statutes §§ 53a-71 (a) (1), 53a-71 (a) (4), 53a-71 (a) (8), 53a-71 (a) (9), 53a-71 (a) (10), 54-250 (2) and 54-251 (a). The reason for a limited registration period in these scenarios is in part because of the presumed existence of a relationship between the actor and the minor. Although sexual assaults against an older minor with whom the actor has a relationship, such as guardian, teacher or coach, still may be predatory, persons who commit sexual assaults through the use of force or the threatened use of force pose a greater danger to the public than those who partake in sexual acts with older minors who may actually consent, but cannot legally consent.

To summarize, intercourse that is compelled, or engaged in with minors under age thirteen or with certain other vulnerable persons, regardless of

the victim's age, require lifetime registration. To the contrary, noncompelled intercourse with older minors requires registration for ten years. We therefore conclude that the defendant's argument that he is similarly situated to those who commit second degree sexual assault against minors is flawed, and thus that the differentiation between second degree sexual assaults and their respective registration requirements at issue here actually is between violent and nonviolent sexual assaults.

[6] The defendant additionally cites to the relevant legislative history in support of his federal equal protection challenge, claiming that the registration requirements for second degree sexual assault are the "arbitrary result of historical accident," and that what legislators thought they were voting for differed from the actual text of the statute. As the court properly noted, "[i]n order for a statute to withstand rational basis review, we consider whether the classification and disparate treatment inherent in a statute bear a rational relationship to a legitimate state end and are based on reasons related to the accomplishment of that goal . . . . [U]nder this analysis, the legislature is not required to articulate the purpose or rationale for its classification. The test . . . is whether [the] court can conceive of a rational basis for sustaining the legislation; we need not have evidence that the legislature actually acted upon that basis." (Internal quotation marks omitted.)

Moreover, where the text of the statute is "plain and unambiguous and does not yield absurd or unworkable results, extratextual evidence of the meaning of the [statute] shall not be considered." (Internal quotation marks omitted.) *State* v. *Maguire*, 310 Conn. 535, 572, 78 A.3d 828 (2013). The defendant acknowledges that the plain meaning of § 54-252 (a) requires lifetime registration. The legislative history of the lifetime sex offender registration requirement, therefore, is not relevant to our review of the defendant's claim on appeal.

[7] Article first, § 1, of the Connecticut constitution additionally provides: "All men when they form a social compact, are equal in rights; and no man or set of men are entitled to exclusive public emoluments or privileges from the community." The present claim has not been made under the foregoing provision.